**2017-1969, -1970**

---

# United States Court of Appeals
# For the Federal Circuit

---

SHENZHENSHI HAITIECHENG SCIENCE AND TECHNOLOGY CO., LTD.,
a People's Republic of China corporation,
*Counter-Defendant*

VIRTUE GLOBAL HOLDINGS LIMITED,
a business company incorporated in the British Virgin Islands,
*Plaintiff-Appellant*

DIGITALDOMAIN 3.0, INC.,
*Movant-Appellant*

v.

REARDEN LLC, a California Limited Liability Company,
REARDEN MOVA LLC, a California Limited Liability Company,
MO2, LLC, a California Limited Liability Company,
MOVA, LLC, a California Limited Liability Company,
*Defendants-Appellees*

---

Appeals from the United States District Court for the Northern District of
California in No. 3:15-cv-00797-JST, Judge Jon S Tigar.

---

## PLAINTIFF-APPELLANT'S OPENING BRIEF

KILPATRICK TOWNSEND & STOCKTON LLP
Jon Michaelson (83815)
jmichaelson@kilpatricktownsend.com
Scott Kolassa (294732)
skolassa@kilpatricktownsend.com
Holly Gaudreau (209114)
hgaudreau@kilpatricktownsend.com
Benjamin M. Kleinman-Green (261846)
bkleinman-green@kilpatricktownsend.com
1080 Marsh Road
Menlo Park, CA 94015
Telephone: (650) 326-2400

Attorneys for Plaintiff-Appellant VIRTUE GLOBAL HOLDINGS LIMITED

## CERTIFICATE OF INTEREST

Counsel for Virtue Global Holdings Limited certifies the following:

1.    The full name of every party represented by us is:

Virtue Global Holdings Limited

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

Virtue Global Holdings Limited

3.    All parent corporations and any publicly held companies that own more than 10 percent or more of the stock of the party represented by us are:

NONE

4.    The names of all law firms and the partners or associates that appear for the party now represented by me in the trial court or agency or are expected to appear in this court are:

Kilpatrick Townsend & Stockton LLP: Jon Michaelson, Frances B. Cox, Scott E. Kolassa, Holly Gaudreau, Benjamin M. Kleinman-Green, Darius Samerotte

Dated:  June 27, 2017                    /s/Jon Michaelson
                                         Jon Michaelson
                                         Kilpatrick Townsend & Stockton LLP
                                         1080 Marsh Road
                                         Menlo Park, CA  94025
                                         Telephone: 650-326-2400
                                         Facsimile:  650-326-2422

                                         Attorneys for Plaintiff-Appellant
                                         VIRTUE GLOBAL HOLDINGS LIMITED

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ...................................................... i

TABLE OF CONTENTS........................................................... ii

TABLE OF AUTHORITIES ...................................................... vi

FEDERAL CIRCUIT RULE 47.5 STATEMENT OF RELATED CASES ........... xi

I.    JURISDICTIONAL STATEMENT ..................................... 1

II.   STATEMENT OF THE ISSUES ...................................... 1

III.  STATEMENT OF THE CASE ......................................... 2

    A.    MOVA ................................................................ 3

    B.    Messiers LaSalle and Perlman ................................ 3

    C.    MOVA Is Incubated by Perlman's Company Rearden and
          Spun Off to OnLive ............................................. 4

    D.    OnLive Fails and Orphans MOVA .......................... 4

    E.    Perlman States that MOVA is Outdated, Has No Value,
          and Proposes that It Be Given to LaSalle .................. 5

    F.    With Perlman's Encouragement and Support, LaSalle
          Forms a New Independent Company, Original MO2,
          to Acquire and Revitalize MOVA ........................... 7

    G.    LaSalle's Original MO2 Acquires the MOVA Assets
          for One Dollar ................................................... 8

    H.    Perlman Changes His Mind, Demands LaSalle Cede
          MOVA to Rearden .............................................. 9

    I.    LaSalle Sells MOVA to SHST, which Grants an
          Exclusive License and Possession of the Assets to DD3 .... 10

    J.    Rearden Decides to Not Pursue Its Claimed Ownership
          of MOVA ......................................................... 12

    K.    After Threat of Suit from Rearden Subsides, Exclusive
          Licensee DD3 Makes Substantial Investments In MOVA ......... 13

    L.    Recognition of MOVA by the Motion Picture Academy
          Provokes a Fight ................................................. 13

    M.    Rearden and Related Companies Make Public Filings
          and Statements Claiming Ownership of MOVA ............... 13

    N.    SHST Sues to Quiet Title ...................................... 14

O.     The Rearden Entities Attempt to Obtain Ownership with a Motion for Summary Judgment, which Fails .................................15

P.     VGH Obtains Ownership of the MOVA Assets, Subject to the Exclusive License to DD3 ..........................................................15

Q.     The Rearden Entities File Multiple Counterclaims............................16

R.     VGH Substitutes for SHST as Plaintiff, and Both VGH and SHST are Counterclaim Defendants .............................................17

S.     SHST Ceases to Participate in Discovery ...........................................18

T.     The Rearden Entities Request A Preliminary Injunction...................18

U.     The District Court Grants Injunctive Relief.......................................18

V.     VGH and Exclusive Licensee DD3 Seek Stay or Modification, Which Is Denied, and Productive Use of MOVA Comes to a Halt Because of the Injunction...........................19

IV.   SUMMARY OF ARGUMENT...................................................................20

V.    ARGUMENT.................................................................................................21

A.     Standard of Review ............................................................................21

B.     The District Court Erred in Finding Likelihood of Success on the Merits.......................................................................................22

1.     There Is No Evidence That the Rearden Entities Were Injured or Prejudiced by the Purportedly Fraudulent Transfer of the MOVA Assets from SHST to VGH.................24

a.     The MOVA Assets Were Never Beyond the Reach of the Rearden Entities or the District Court, but Always in the Possession of Non-Party Exclusive Licensee DD3 ................................................24

b.     The Rearden Entities Cannot Qualify as a Creditor under the California Uniform Voidable Transfer Act ...................................................27

2.     The District Court Erred in Finding That Title to the MOVA Assets was Transferred with Intent to Hinder, Delay, or Defraud .......................................33

C.     The District Court Erred in Finding Likelihood of Irreparable Harm ...............................................................................40

1.      The Rearden Entities Were Dilatory in Requesting an
        Injunction ..................................................................................40

2.      The District Court Erred in Determining That
        the Rearden Entities Established a Likelihood
        of Dissipation of Assets. ...........................................................41

        a.      The Rearden Entities Admit That the Few
                Items of Hardware Which They Claim Were
                Discarded Had Little or No Value and Were
                Fungible; DD3 Replaced Those Items ...........................42

        b.      The Acts and Omissions of SHST on which
                the District Court Based its Finding Did Not
                Relate To, Much Less Cause, the Supposed
                Dissipation ....................................................................45

        c.      The District Court Failed to Consider the
                Fact that VGH and Exclusive licensee DD3
                Have Assured the Integrity and Availability
                of the MOVA Assets .....................................................47

D.      The District Court Erred in Finding That the Balance
        of Equities Weighs in Favor of Injunctive Relief and
        That an Injunction Serves the Public Interest .....................................49

        1.      The Balance of the Equities Tips Against an Injunction ..........49

        2.      The Preliminary Injunction Does Not Serve the
                Public Interest ............................................................................50

E.      The Injunction is Impermissibly Broad Because It Bars
        Not Just Transfer, But Long-Standing Use of the MOVA
        Assets by Non-Party Exclusive Licensee DD3, Impairing
        the Value of the Very Property It Seeks to Protect .............................51

        1.      The Use Restriction Is Not Narrowly Tailored to
                Remedy the Alleged Harm...........................................................52

        2.      The Use Restriction Does Not Maintain the Status Quo ..........54

        3.      The Injunction Should Be Modified to Allow Use..................55

        4.      Absent Modification, the Value of the MOVA Assets
                will be Diminished Or Destroyed ...............................................55

VI.    CONCLUSION..............................................................................................56

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Passage Media Corp. v. Cass Communications, Inc.*,
  750 F.2d 1470 (9th Cir. 1985) ....................................................................42, 47

*Americans for Prosperity Found. v. Harris*,
  809 F.3d 536 (9th Cir. 2015) ...............................................................................35

*Annod Corp. v. Hamilton & Samuels*,
  100 Cal. App. 4th 1286 (2002) .............................................................35, 37, 39

*Apple v. Samsung*,
  695 F.3d 1370 (Fed. Cir. 2012) ..........................................................................47

*In re Bernal*,
  207 F.3d 595 (9th Cir. 2000) .......................................................................36, 53

*In re Beverly*,
  374 B.R. 221 (B.A.P. 9th Cir. 2007) ............................................................34, 35

*In re Blanchard*,
  547 B.R. 347 (Bankr. C.D. Cal. 2016) ...............................................................28

*Califano v. Yamasaki*,
  442 U.S. 682, 99 S. Ct. 2545 (1979)............................................................52, 54

*Cannon v. Wells Fargo Bank*,
  917 F. Supp. 2d 1025 (N.D. Cal. 2013)...............................................................30

*Caribbean Marine Serv. Co. v. Baldridge*,
  844 F.2d 668 (9th Cir. 1988) ...............................................................................42

*CopyTele, Inc. v. E Ink Holdings, Inc.*,
  962 F. Supp. 2d 1130 (N.D. Cal. 2013)...............................................................13

*In re Cushman Bakery*,
  526 F. 2d 23 (1st Cir. 1975)..................................................................................35

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
  967 F.2d 1280 (9th Cir. 1992) .............................................................................55

*EEOC v. Arabian Am. Oil Co.*,
    499 U.S. 244 (1991)...............................................................................29

*Fidelity Nat. Title Ins. Co. v. Schroeder*,
    179 Cal. App. 4th 834 (2009) ..............................................................24

*Gen. Battery Corp. v. Globe-Union, Inc.*,
    100 F.R.D. 258 (D. Del. 1982) .............................................................38

*Gonzales v. O Centro Espirita Beneficente Uniao
    do Vegetal*, 546 U.S. 418, 126 S. Ct. 1211 (2006) ............................21

*Hassen v. Jonas*,
    373 F. 2d 880 (9th Cir. 1967) .........................................................26, 27

*Herb Reed Ent., LLC v. Fl. Ent.*,
    736 F.3d 1239 (9th Cir. 2013) .......................................................42, 48

*Illinois Tool Works, Inc. v. Grip-Pak, Inc.*,
    906 F. 2d 679 (Fed. Cir. 1990) .............................................................49

*In re iPhone Application Litigation*,
    844 F. Supp. 2d 1040 (N.D. Cal. 2012).................................................30

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009) ..............................................................41

*Kelleher v. Kelleher*,
    2015 WL 5693726 (N.D. Cal. Sept. 29, 2015)......................................24

*Kodadek v. MTV Networks, Inc.*,
    152 F.3d 1209 (9th Cir. 1998) ..............................................................30

*Lilith Games (Shanghai) Co. v. UCool, Inc.*,
    2015 WL 5591612 (N.D. Cal. September 23, 2015).............................50

*Litecubes, LLC, v. Northern Light Prod., Inc.*,
    523 F.3d 1353 (Fed. Cir. 2008) ............................................................29

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009) ................................................................55

*Mehrtash v. Mehrtash*,
    93 Cal. App. 4th 75 (2001) ................................................................24

*Microsoft Corp. v. AT&T Corp.*,
    550 U.S. 437 (2007)..........................................................................28

*Nat. Res. Def. Council, Inc. v. Winter*,
    508 F.3d 885 (9th Cir. 2007) ...........................................................52

*Nutrition 21 v. United States*,
    930 F.2d 867 (Fed. Cir. 1991) .........................................................41

*Oakland Tribune, Inc. v. Chronicle Publ. Co., Inc.*,
    762 F.2d 1374 (9th Cir. 1985) .........................................................41

*Ocean Garden, Inc. v. Marktrade Co., Inc.*,
    953 F.2d 500 (9th Cir. 1991) ...........................................................29

*Open Text, S.A. v. Box, Inc.*,
    36 F. Supp. 3d 885 (N.D. Cal. 2014).................................................49

*Opperman v. Path, Inc.*,
    87 F. Supp. 3d 1018 (N.D. Cal. 2014)..............................................26

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*,
    636 F.3d 1150 (9th Cir. 2011) ...................................................52, 55

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) .........................................................21

*In re Rearden LLC*,
    841 F.3d 1327 (Fed. Cir. 2016) .........................................................1

*Renda v. Nevarez*,
    223 Cal. App. 4th 1231 (2014) ...................................................26, 27

*Sanofi-Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006) .......................................................21

*Sierra Forest Legacy v. Rey*,
    577 F.3d 1015 (9th Cir. 2009) ...........................................21, 51, 54

*Silvaco Data Sys. v. Intel Corp.*,
184 Cal. App. 4th 210 (2010) ...............................................................30

*Sunnyside Dev. Co., LLC v. Opsys Ltd.*,
2007 WL 2462142 (N.D. Cal. Aug. 29, 2007) ............................................25, 36

*Tinnus Enter., LLC v. Telebrands Corp.*,
846 F.3d 1190 (Fed. Cir. 2017) .........................................................21

*United States v. BNS Inc.*,
858 F.2d 456 (9th Cir. 1988) .............................................................55

*Wimbledon Fund, SPC Class TT v. Graybox*,
2016 WL 1554271 (9th Cir. April 18, 2016)................................................32, 33

*Wimbledon Fund, SPC v. Graybox, L.L.C.*,
2015 WL 5822580 (C.D. Cal. September 29, 2015) ...................................32, 33

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)........................................................................40, 49

*Wyzard v. Goller*,
23 Cal. App. 4th 1183 (1994) .........................................................35

## Statutes

28 U.S.C. §1292(a)(1)......................................................................1

28 U.S.C. §1332(a) .........................................................................1

Cal. Bus. & Prof. Code §17200 .................................................................30

Cal. Civ. Code §3439 (California Uniform Voidable
Transactions Act).....................................................................*passim*

Cal. Code Civ. P. §339 (1).......................................................................30

**Other Authorities**

3 Witkin, Cal. Proc. 5th Actions §493 (2016) .........................................................31

8 Witkin, Cal. Proc., Enforcement of J. §497 (5th ed. 2008) ..................................25

37 C.F.R. 1.366 ......................................................................................................12

California Civil Jury Instructions, No. 4200...........................................................22

Fed. R. Civ. P. 25(c)...............................................................................................25

Manual of Patent Examining Procedure § 301 (2015) ...........................................14

Trademark Manual of Examining Procedure § 503.01 (2017)................................14

7A Wright and Miller, Federal Practice and Procedure § 1958
    (2d ed. 1986) .....................................................................................................38

**FEDERAL CIRCUIT RULE 47.5 STATEMENT OF RELATED CASES**

1.     Previously before this Court was Case No. 2016-125 "In Re Rearden, LLC, Rearden Mova, LLC, MO2, LCC, MOVA, LLC." This was a petition for writ of mandamus. It was denied on November 17, 2016 by a panel of Judges Moore, Hughes, and Stoll. It was reported as *In re Rearden LLC*, 841 F.3d 1327 (Fed. Cir. 2016). The Federal Circuit found that it had exclusive jurisdiction over appeals from this matter and then denied the petition.

2.     The following related case is currently pending before this Court of Appeals: *Shenzhenshi Haitiecheng Sci. v. Rearden LLC*; Case No. 17-1970. This appeal was consolidated with the instant action by order of this Court on May 3, 2017.

3.     To the best of VGH's knowledge there are no other cases pending in this or any other Court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## I.    JURISDICTIONAL STATEMENT

The District Court has diversity jurisdiction pursuant to 28 U.S.C. §1332(a). This appeal is from an order granting a preliminary injunction, affording this Court jurisdiction pursuant to 28 U.S.C. §1292(a)(1).  The District Court entered its order on June 17, 2016.  Appx4-19.  Plaintiff -Appellant Virtue Global Holdings Ltd. ("VGH") filed a timely Notice of Appeal in the Ninth Circuit on June 21, 2016. Appx373-391.  On April 21, 2017, the Ninth Circuit granted the parties' joint motion to transfer the case to this Court, which has jurisdiction because this Court earlier found the patent infringement counterclaim filed by Defendants-Appellees Rearden LLC ("Rearden"), Rearden Mova, LLC, MO2, LLC and Mova LLC (collectively, "Rearden Entities") to be compulsory.  *See In re Rearden LLC*, 841 F.3d 1327, 1333 (Fed. Cir. 2016) (exercising jurisdiction over mandamus petition).

## II.    STATEMENT OF THE ISSUES

1.    Whether the District Court erred in finding that the Rearden Entities are likely to succeed on the merits of their counterclaim that transfer of the subject matter of this case – the MOVA Assets – from Shenzhenshi Haitiecheng Science and Technology Co., Ltd. ("SHST") to VGH violated the California Uniform Voidable Transaction Act ("CUVTA"), Cal. Civ. Code §3439, despite the Rearden Entities having suffered no injury from the alleged fraudulent transfer.

1

2.     Whether the District Court erred in finding that the Rearden Entities are likely to sustain irreparable harm in the absence of an injunction despite their three-year delay and despite the absence of connection between the alleged fraudulent transfer and any actual or prospective injury.

3.     Whether the District Court erred in finding that the balance of equities weighs in favor of the Rearden Entities and that an injunction serves the public interest, despite the Rearden Entities never having been deprived of an effective remedy and despite the imposition of unnecessary harm on third parties.

4.     Whether the District Court's injunction is impermissibly broad because it prohibits not just transfer, but longstanding use of the MOVA Assets by a non-party exclusive licensee, impairing the value of the very property it seeks to protect.

## III.    STATEMENT OF THE CASE

This case turns on ownership of MOVA:  hardware, software, and intellectual property used for facial motion capture to generate images, mainly for the film industry.  Appx70.  Although, as set forth below, the underlying dispute stems from a disagreement about who controlled a company referred to as Original MO2 when it acquired the MOVA Assets in February 2013, the preliminary injunction was granted based on the Rearden Entities' challenge to a transaction between original plaintiff SHST and VGH, which has no bearing on

2

whether any of the Rearden Entities owns the MOVA Assets.

## A. MOVA

The key physical components of MOVA are cameras, lights, and computers.  Appx70, Appx459-460 at 111:24-112:9.  Mounted on a metal tube frame (or "rig"), the lights and cameras surround the front half of a performer, illuminating and enabling each camera – under control of software in a computer – to capture a stream of information from a small segment of a facial performance.  The different perspectives obtained from the resulting data allow creation of a three-dimensional representation of the performance.  The 3-D representation can be provided by MOVA or by software from third parties.  Additional software (not part of MOVA) can manipulate the data to yield a desired end product, such as a sequence of facial images for use in a film.[1]

## B. Messiers LaSalle and Perlman

The principal individuals in this controversy are Greg LaSalle and Stephen Perlman.  These gentlemen first met in the 1970s.  Appx77 ¶3.  In 2000, after Perlman became financially successful, he offered "dear friend" LaSalle a job with his company Rearden.  (*Id*.)  LaSalle accepted.

---

[1] For example, MOVA was used to animate the face of the character "Thanos" in *Guardians of the Galaxy* and the character "Colossus" in *Deadpool*.  It was also used to create images of George Clooney and Sandra Bullock superimposed into scenes of *Gravity*.

### C. MOVA Is Incubated by Perlman's Company Rearden and Spun Off to OnLive

Historically, Rearden generated new technologies and spun them off. That happened with MOVA. Although LaSalle's initial assignments involved building a studio at Rearden's facility, he also contributed to development of MOVA. Appx78-79 ¶6. By 2007, Rearden spun MOVA off as a small part of a new business called OnLive, which focused on internet gaming technology also incubated at Rearden. (*Id.*) Perlman was CEO of OnLive and a major investor. Appx164 at 19:9-19.

From 2007 into August 2012, LaSalle and a few others, including Ken Pearce, worked at OnLive. Appx78-80 ¶¶6-7. Their group offered facial motion capture services utilizing MOVA Assets. (*Id.*) Although there was steady work, the market found MOVA expensive. (*Id.*) Procedures, equipment, and software became outdated, but OnLive did not invest to improve efficiencies or to keep MOVA current. (*Id.*)

### D. OnLive Fails and Orphans MOVA

OnLive failed, and in August 2012 transferred its assets – including MOVA – to a company called OL2, Inc. Appx80 ¶8. OL2 hired some OnLive employees, but no one from the MOVA group. Appx80 ¶¶8-9, Appx134-135 ¶4. Perlman offered some positions at Rearden to some former OnLive employees,

including offers of temporary work to LaSalle and Pearce.  Appx81 ¶10, Appx172 at 102:6-15.

On August 20, 2012, LaSalle and Pearce each signed standard contracts prepared by Rearden:  an offer letter, a Proprietary Information and Inventions Agreement ("PIIA"), and a Mutual Agreement to Arbitrate Claims.  Appx135 ¶¶5-6, Appx140-157, Appx81 ¶¶12–13, Appx50-65, Appx180-182 at 21:2-23:8, Appx170-171 at 98:21-99:11.  Contrary to policy and practice at Rearden, neither LaSalle nor Pearce had a written job description then or later.  Appx81-82 ¶14, Appx135 ¶5, Appx182-183 at 23:9-24:21, Appx184-187 at 29:5-32:7.  No one told LaSalle or Pearce that their duties encompassed acquisition of MOVA Assets for use by Rearden, and neither had any such understanding.  Appx81 ¶13, Appx135 ¶5.  The MOVA Assets were owned by OL2, and no one else had rights to the property.  Appx82 ¶15, Appx135 ¶6, Appx188 at 62:18-20.

The future of MOVA was uncertain.  Appx81-82 ¶14, Appx135 ¶6.  OL2 had no interest and offered the MOVA Assets to Perlman at no cost.  Appx82-83 ¶16, Appx99.  Perlman declined (several times) and stated that Rearden would not invest to modernize MOVA.  Appx83-84 ¶¶17-18, Appx99.

### E.  Perlman States that MOVA is Outdated, Has No Value, and Proposes that It Be Given to LaSalle

In September 2012, Perlman proposed to OL2 that it transfer the MOVA Assets to LaSalle and Pearce at no cost.  Appx83 ¶18, Appx99.  Perlman

5

summarized the status of MOVA as follows: "[t]here has been effectively no R&D

since 2006…; MOVA has been a slightly less than break-even business (about

$100K loss/year), but work has dropped off as the industry [moved to different

technology] and we've had no budget for R&D[,] [s]o they need to invest in R&D

to stay current;…. I don't see the patents as monetizable [in light of new industry

techniques]." He added that he doubted a "buyer could be found, because the

system is old and unusable without Greg and Ken…."[2]  And he recommended that

OL2

> "….let them have a go at it…. I'll … provide them with
> business advice and help them over the bumps (as I do
> for many little companies), but they need eventually [to]
> get it running under their own steam….MOVA is Greg
> and Ken's career right now, and I think it is the right
> thing to give them a shot to continue it."

Appx103-104. When OL2 agreed Appx84 ¶19, Appx101-104, Perlman responded

with thanks and said, "I'll help Greg and Ken with the legal resources …, but I'll

leave it to them to put it together and drive it forward." Appx84 ¶20, Appx72-73.

---

[2] Confirming such pre-litigation statements, in deposition Perlman admitted *inter
alia* that cameras and computers included in MOVA in 2012 could not be re-used
and that MOVA software was beyond needed modification. Appx459-460 at
111:24-112:8, Appx70.

**F. With Perlman's Encouragement and Support, LaSalle Forms a New Independent Company, Original MO2, to Acquire and Revitalize MOVA**

Perlman introduced LaSalle to an attorney at the Bingham law firm to help establish a company and negotiate with OL2. Appx106-108. LaSalle signed an engagement letter which identified the entity to be formed – MO2 LLC ("Original MO2") – as Bingham's client.[3] Appx85-86 ¶¶25-26, Appx106-108, Appx110-113, Appx115-119.

On November 9, 2012, LaSalle formed Original MO2. Appx86 ¶27, Appx121-122, *see* Appx165-167 at 29:12-31:15. No Rearden company held an ownership interest in Original MO2. Appx86 ¶¶27-28, Appx121-122. LaSalle was the only managing member of the entity. (*Id.*) LaSalle continued to work as an employee of Rearden, but Perlman did not state or suggest that Original MO2 was a subsidiary or created for the benefit of Rearden. Appx86, Appx121-122.

From fall 2012 into February 2013, negotiations proceeded between Bingham (for Original MO2) and OL2 over MOVA. Appx87 ¶¶29-30. LaSalle kept Perlman informed; Perlman aided LaSalle. Appx87-88 ¶31. Perlman gave advice, including that the MOVA patents were not worth maintaining. Appx70.

---

[3] As alleged in the Complaint, Appx21 ¶¶15, 20, nearly two years later in September 2014, Defendants established a different company with the same name ("MO2 LLC") as the entity formed in November 2012. The parties refer to the November 2012 entity as "Original MO2." The company formed in September 2014 is a Defendant.

During this process, Perlman did not once state or suggest that after Original MO2 obtained the MOVA Assets, those would belong to Rearden.  Appx87 ¶¶29-31. Quite the opposite, in November 2012, Perlman wrote:  "…this transaction is between Greg and OL2, and I am not a party involved.  I'm just offering suggestions and information to the extent it is helpful."  Appx86 ¶28, Appx94 ¶54, Appx124.  Similarly, in January 2013, Perlman announced during a social gathering that he had helped LaSalle acquire MOVA so that LaSalle could start a new business.  Appx89 ¶37.

### G. LaSalle's Original MO2 Acquires the MOVA Assets for One Dollar

On February 11, 2013, Original MO2 purchased the MOVA Assets from OL2 for cash consideration of one dollar.  Appx41, ¶19, Appx43-46.  That was the price Perlman had proposed to OL2:  "… I suggest you sell ALL of MOVA (patents, equipment, hardware, software, trademark, domain) for $1 to these guys….it is VERY clear that it will never be a substantial business."  Appx75, Appx. 44, Appx84 ¶21.

Following the demise of OnLive, LaSalle and Pearce had tried to assure the survival of MOVA.  Appx88 ¶32.  When they learned that neither OL2 nor Perlman was willing to invest, they contacted prior customers to explore interest in acquisition or partnering.  (*Id.*)  One former customer was Digital Domain 3.0 ("DD3"), a visual effects company based in Los Angeles.  Appx88 ¶34, Appx136-

137 ¶14.  LaSalle kept Perlman informed on this score, disclosing contacts with DD3 in October 2012 and again in early 2013.  Appx89 ¶¶35, 36, Appx189-190 at 74:22-75:21.  Perlman never objected.  (*Id.*)

Soon after Original MO2 acquired the assets, LaSalle took steps to initiate a sale or other undertaking with a third party.  Appx89-90 ¶¶38–39.  On February 14, 2013, he sent Perlman a list of MOVA patents and trademarks to ask Perlman's opinion as to what should be maintained.  Appx89 ¶38.  That same day, LaSalle asked Rearden CFO Cindy Ievers for help obtaining copies of MOVA financial statements to share with DD3 and others.  Appx89 ¶38, Appx95-96 ¶¶57, 60, Appx191-192 at 78:19-79:25.

## H. Perlman Changes His Mind, Demands LaSalle Cede MOVA to Rearden

The next day, Ievers told LaSalle that Perlman had told her that he (Perlman) wanted MOVA and that LaSalle should arrange a transfer to Rearden.  Appx90 ¶¶39-40.  LaSalle was surprised.  Appx90 ¶40)  He responded that if Perlman had changed his mind, Perlman should communicate that directly.  Appx91-92 ¶42.  LaSalle also sent an email to Perlman referencing their friendship.  Appx90 ¶40, *see* Appx48.[4]

---

[4] LaSalle knew Perlman well.  Appx90 ¶40.  He hoped that if Perlman slowed down to consider what he was demanding (say by drafting a responsive message), he would revert to views previously expressed that he was not interested in MOVA and that MOVA was "Greg and Ken's career."  (*Id.* ¶40; *see* Appx99.)

Perlman and LaSalle met on February 26, 2013.  Appx90-91 ¶41, *see* Appx193:1-24.  In their conversation, Perlman claimed that MOVA was "his," that he wanted it back, and that LaSalle should give it to him.  Appx90-91 ¶41, *see* Appx137 ¶15.  LaSalle responded that he did not understand the sudden change, and reminded Perlman of promises made since August.  Appx90-91 ¶41.  Perlman became enraged, said he "deserved" MOVA, and demanded that LaSalle turn the assets over immediately.  (*Id.*)  LaSalle reminded Perlman that he (LaSalle) was in talks with DD3 for possible purchase of MOVA along with hiring Pearce and LaSalle to re-start the MOVA business.  (*Id.*)  Perlman insisted again that LaSalle respond immediately; LaSalle declined.  (*Id.*)  Perlman fired LaSalle as a Rearden employee.  (*Id.*)

A few days later, Perlman met with Pearce.  Appx137 ¶16.  Perlman confirmed that he wanted MOVA and admitted that this was a change, inconsistent with representations made to LaSalle, Pearce, and others.  (*Id.*)

LaSalle submitted a letter of resignation on March 5, 2013 (because in the interim Perlman told Ievers that LaSalle had not been fired).  Appx91-92 ¶42.  Pearce also ended his employment at Rearden on March 5th.  Appx138 ¶18.

## I.    LaSalle Sells MOVA to SHST, which Grants an Exclusive License and Possession of the Assets to DD3

As of April and May 2013, two parties were interested in the MOVA Assets.  Appx92 ¶45.  Rearden's lawyers threatened to sue LaSalle for breach of the PIIA,

which they asserted required him to transfer MOVA to Rearden.  (*Id.*)  LaSalle (through his lawyers) indicated willingness to entertain any reasonable proposal, but Perlman insisted the property be turned over without assurance of re-starting a MOVA business or employing LaSalle and Pearce.  (*Id.*)  By contrast, DD3 was willing to invest in MOVA, as well as to hire LaSalle and Pearce to lead the effort.  (*Id.*)  DD3 also offered to pay a small sum to Original MO2.  (*Id.*)  Original MO2 selected DD3.  (*Id.*)

Before a contract was finalized, the parent of DD3 directed that ownership of the MOVA Assets be vested in an unrelated holding company, SHST, a China-based entity.  Appx93 ¶46, Appx160 ¶8.  The agreement transferring MOVA from Original MO2 to SHST was entered on May 8, 2013.  Appx93 ¶46, Appx160 ¶8.  SHST then licensed DD3 to use MOVA on a fully paid, exclusive, perpetual basis.  Appx93 ¶46, Appx160 ¶8.[5]  Although title to MOVA Assets was obtained by SHST, all hardware, software, and other physical items were transferred by Original MO2 directly to DD3 – and have remained with DD3 since.  Appx328 ¶¶2-5, Appx329 ¶¶6, 7, Appx431 ¶¶18, 19.  SHST retained no economic interest, nor any control over the location or use of the property.  Appx425-426 ¶¶4, 6, 7, Appx434-436.  Even the price it paid to Original MO2 was underwritten by DD3's parent.  Appx329 ¶7.

---

[5] As promised, DD3 hired LaSalle and Pearce.

**J.  Rearden Decides to Not Pursue Its Claimed Ownership of MOVA**

By the end of May 2013, Perlman knew about the sale of MOVA, including

DD3's participation and that a foreign company was also involved.  Appx332-333.

He continued to pursue LaSalle and Original MO2.  Appx93 ¶48.  At the end of

June 2013, a Rearden lawyer sent LaSalle a demand letter asserting that Rearden

owned the MOVA assets by virtue of the PIIA and suggesting arbitration pursuant

to the Mutual Agreement to Arbitrate.  Appx126-129.  LaSalle's lawyer responded,

denying Rearden's ownership contentions but agreeing to arbitrate.  Appx93 ¶49,

Appx131-132.

Rearden never initiated arbitration.  Appx93 ¶50, Appx173-174 at 108:23-

109:12.  According to Perlman, that was because "… arbitration …. would be a

big, long, drawn out thing that would only achieve one result … the transfer of the

physical assets.  So the physical assets were computers that were bought in 2006

and included florescent lights.  I could … replace the florescent lights with … LED

lights, which didn't exist in 2006.  So there wasn't much there that I needed to

recover.  The cameras were lower than HD resolution …."  Appx459-460 at

111:24-112:9.[6]

---

[6] Perlman thought at the time that MOVA's value rested entirely in the patents and
he believed he could achieve ownership of those by paying maintenance fees.
Appx460-461 at 112:14-113:6.  That belief was in error, as even Perlman admitted
later.  Appx275 ¶187.  37 C.F.R. 1.366 ("any person or organization may pay

### K. After Threat of Suit from Rearden Subsides, Exclusive Licensee DD3 Makes Substantial Investments In MOVA

Meanwhile, in June 2013, when it learned of new threats from Perlman, DD3 suspended plans to modernize MOVA. Appx160-161 ¶¶9, 10. But after Rearden failed initiate arbitration, it began to invest and continued to do so – ultimately to the tune of $500,000. Appx161 ¶¶11-14, Appx427 ¶9. That restored the MOVA business and increased the value of the MOVA Assets. Appx427 ¶9.

### L. Recognition of MOVA by the Motion Picture Academy Provokes a Fight

In August 2014, the Motion Picture Academy nominated MOVA for a scientific and technical award. Appx237, ¶25. Among others, LaSalle was selected to receive recognition; Perlman was not. Appx335-338. Perlman protested to the Academy. (*Id*.) The battle began.

### M. Rearden and Related Companies Make Public Filings and Statements Claiming Ownership of MOVA

In September 2104, Perlman caused Defendant MO2 to be formed, using the same name as Original MO2. Appx167-168 at 31:16–32:14.[7] Soon after, Rearden's patent counsel recorded in the USPTO the February 2013 agreement between OL2 and Original MO2, but misrepresented it as assigning MOVA

---

maintenance fees"). *See also CopyTele, Inc. v. E Ink Holdings, Inc.*, 962 F. Supp. 2d 1130, 1140 (N.D. Cal. 2013) (payment of maintenance fees not dispositive of ownership of patents).

[7] LaSalle had formally dissolved Original MO2 in November 2013.

patents to Defendant MO2.  Appx21-22 ¶21, Appx26-29.  The next day, patent

counsel recorded an assignment of the patents from Defendant MO2 (which could

not have and never did own them) to Rearden Mova.  Appx22 ¶22, Appx31-33, *see*

Appx168-169 at 32:16-33:13, Appx175-176 at 253:7-254:15, Appx264-267,

Appx273.[8]

In late 2014, counsel for SHST contacted Rearden's counsel about

correcting the record.  Appx261-262.  There was no substantive response, but

Rearden did petition the USPTO to expunge the assignment to Rearden Mova.

In early 2015, the Rearden Entities made public statements that they owned

MOVA.  Appx237 ¶¶25-26.

### N. SHST Sues to Quiet Title

In February 2015, prompted by Rearden's agency filings and public claims,

SHST brought suit to quiet title – seeking, *inter alia,* declaratory relief that none of

the Rearden Entities owned MOVA and that the assignments filed in the USPTO

---

[8] Defendant Mova, LLC also filed false trademark assignments.  Appx237 ¶23, Appx241-243.  As with Perlman's misconception that paying maintenance fees on issued patents would confer title, recording patent or trademark assignments at the USPTO does not confer ownership rights either.  *See* Trademark Manual of Examining Procedure §503.01 (2017) ("recording of a document … is not a determination … of the validity of the document or the effect that document has on the title") and Manual of Patent Examining Procedure §301 (2015) ("recording of the assignment is merely a ministerial act; it is not an Office determination of the validity of the assignment document or the effect of the assignment document on the ownership of the patent property").

were invalid.  Appx23.  The Rearden Entities responded with their own claim for declaratory relief that Rearden Mova owned the property.  Appx36 at 17:9-10.

### O. The Rearden Entities Attempt to Obtain Ownership with a Motion for Summary Judgment, which Fails

In June 2015, the Rearden Entities brought a motion for summary judgment based on LaSalle's PIIA to resolve in their favor the core question of who obtained ownership of MOVA in February 2013.  On October 15, 2015, just before he retired, Judge Samuel Conti denied the motion.  Appx196-203.  He did so based on two of nine separate factual and legal grounds raised in opposition, expressly not ruling on the other reasons to deny that any Defendant owned MOVA.  *Id*.

### P. VGH Obtains Ownership of the MOVA Assets, Subject to the Exclusive License to DD3

In mid-2015, while summary judgment was pending, DD3's ultimate parent (DDHL) contemplated transfer of title to the MOVA Assets from SHST to a DDHL subsidiary – VGH – to bring ownership and licensed use of MOVA within the same corporate family.  Appx329, ¶7.  After Judge Conti's decision rejecting the Rearden Entities' peremptory attempt to obtain ownership, the transaction moved forward.  On December 17, 2015, VGH purchased the MOVA Assets from SHST, subject to the license granted to DD3. The total price was $50,000, paid up front by DDHL.  Appx464¶2.  Although the title holder

changed, possession and use of MOVA remained with DD3.[9]  Appx328 at ¶¶2-5,

Appx426 at ¶¶6, 7, Appx431 at ¶¶18, 19.

### Q. The Rearden Entities File Multiple Counterclaims

One day earlier, at the December 16, 2015 case management conference

before newly-assigned Judge Jon Tigar, the Rearden Entities received leave to

assert additional counterclaims.  Appx204.  In January 2016, counsel for SHST

and VGH apprised the Rearden Entities' counsel of VGH's purchase of MOVA,

and the parties discussed substitution of VGH for SHST as plaintiff.

On February 12, 2016, the Rearden Entities filed 18 new counterclaims all

based on allegedly wrongful conduct not by VGH or SHST, but by licensee DD3

which was not joined in the action and still is not a party.  Appx206-228.[10]  Each

of the Rearden Entities' new charges was (and remains) dependent on a showing

that one of them owns the MOVA Assets.

On March 2, 2016, the District Court granted the parties' request to

---

[9] Moreover, in addition to never having possessed or used the property, neither
SHST nor VGH ever participated in any aspect of DD3's MOVA business.

[10] The new counterclaims included patent infringement, trademark infringement,
copyright infringement, and cybersquatting under federal law based on use of the
MOVA Assets, as well as an array of state law causes for misappropriation of trade
secrets, conversion, interference with contract and prospective advantage, unfair
competition, trespass, and unjust enrichment.  Appx206-228.  The Rearden Entities
also propounded a new theory of ownership based on a supposed transfer to
Rearden Mova in April 2013, in response to threats of litigation from Rearden.
There is no evidence that any such transfer took place.  Appx257-258 at 8:22-9:7.

bifurcate, with respective claims as to ownership to be decided first. Appx229-230. The District Court also stayed VGH's obligation to respond to the counterclaims (except for the Rearden Entities' counterclaim for declaratory relief) until after a decision concerning ownership. Appx231.

Later in March, when counsel for SHST attempted to contact the company regarding discovery matters, SHST did not respond. This was not unusual as it often took time to obtain a response from China-based SHST. Counsel continued to follow up regarding discovery.

### R. VGH Substitutes for SHST as Plaintiff, and Both VGH and SHST are Counterclaim Defendants

On March 21, 2016, VGH substituted for SHST as plaintiff and became a counterclaim defendant. Appx244-247. VGH filed a First Amended Complaint requesting, *inter alia,* the same declaratory relief sought previously by SHST. Appx236 at 9:12-19. The Rearden Entities answered and amended their counterclaims to add one new charge: that the December 2015 SHST to VGH transfer violated the California Uniform Voidable Transactions Act. Appx255. On April 18, 2016, VGH and SHST responded to the Rearden Entities' declaratory relief counterclaim of ownership. Appx255 at n. 1. They did not address fraudulent transfer allegations because that theory – like other later-added counterclaims – is only viable if one of the Rearden Entities owns the MOVA Assets, and the obligation to respond had been stayed. Appx231.

17

### S.  SHST Ceases to Participate in Discovery

Ongoing attempts to obtain a response from SHST regarding discovery issues were not successful.  Appx279.  On April 25, counsel for SHST informed the Rearden Entities' counsel of the apparent "disappearance" of SHST.  Appx277-278.

### T.  The Rearden Entities Request A Preliminary Injunction

On May 6, 2016, the Rearden Entities filed a Motion for Preliminary Injunction, arguing that the transfer from SHST to VGH was fraudulent.  Appx280-306.  They sought to restrain SHST, VGH, and DD3 from "all use of the physical MOVA Assets (and secure those assets in a neutral location)," from all use of the MOVA intellectual property, and from making "any . . . transfer of the MOVA Assets to any other party."  Appx300.

### U.  The District Court Grants Injunctive Relief

On June 17, 2016, the District Court issued its Order Granting Motion for Preliminary Injunction ("Order").  The Court barred SHST and VGH "pending trial, from selling, using, moving, concealing, transferring or otherwise disposing of any MOVA Asset in its possession, custody or control."  Appx18-19.  It required the "transfer [of] any physical MOVA assets to a secure location of Defendants' choosing."  Appx19 at 16:2-3.  And it directed VGH to transmit a copy of the preliminary injunction to DD3 with the expectation that DD3 would comply even though it was not party.  (*Id.*)

18

**V. VGH and Exclusive Licensee DD3 Seek Stay or Modification, Which Is Denied, and Productive Use of MOVA Comes to a Halt Because of the Injunction**

On June 27, 2016, VGH filed a motion to stay or modify the injunction, and DD3 submitted its own motion to modify the restraint.  As part of its request, DD3 provided evidence that the enjoining "use, storage, transfer and all business and financial aspects MOVA and MOVA creative projects . . . solely affected DD3 and its client media producers," and would halt productive use of MOVA.  Appx425-426 ¶4.  DD3 also provided evidence that since 2013 it had carefully maintained and upgraded MOVA, devoting significant resources to building awareness of and demand for MOVA, and that "sudden disruption of MOVA services . . . will cause client confusion, harm [] reputation and interfere with contracts and prospects," permanently "injur[ing] MOVA's brand and advanc[ing] competitor interests." Appx427-429 ¶¶10, 12.  Moreover, DD3 provided evidence that the injunction would interfere with its ability to complete work already started on projects for two film industry customers.  Appx428 ¶11.

On July 15, 2016, the District Court denied the requests by VGH and DD3. Appx1-3.  As a result, the MOVA business has been shut down, the physical assets which are part of MOVA are sequestered in a storage unit, and the MOVA brand and services which had been revived by DD3 cannot be offered to film and allied industry customers.

19

## IV.   SUMMARY OF ARGUMENT

Unlike a true fraudulent transfer, the transaction challenged in this case involved only a change in the identity of the holding company in which title to the disputed MOVA Assets was vested.  Paper was shuffled, but the property itself never moved, was never hidden, and was never dissipated.  Rather, at all times MOVA remained intact and available to the Rearden Entities, and the transferee substituted in as plaintiff and is subject to the District Court's judgment in this case.  As a result, the District Court's finding of likelihood of success on the merits cannot be sustained.

Unlike a situation where a preliminary injunction may be warranted to prevent irreparable harm, in this instance the Rearden Entities waited three years before requesting relief and furnished no proper evidence (as opposed to speculation) demonstrating that mere transfer of title to the MOVA Assets caused or could possibly result in any injury.

Unlike the balance struck when an injunction is appropriate, in this instance the need to preserve a remedy for the Rearden Entities was low or non-existent while prospects for damage on the other side of the equation were substantial.  The restraint imposed by the District Court threatens harm to third parties and the public.

For these reasons, and for others as well, the Order issued by the District Court should be vacated. And if not, at the very least the injunction should be modified to reduce or eliminate the needless damage it does to the MOVA licensee and its customers who are not party to the litigation.

## V.   ARGUMENT

### A. Standard of Review

On appeal, courts "review the District Court's legal rulings *de novo* and its ultimate decision to issue the preliminary injunction for abuse of discretion." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428, (2006).

The Federal Circuit reviews preliminary injunctions using the law of the regional circuit. *Tinnus Enter., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1202 (Fed. Cir. 2017).

"The district court must support a preliminary injunction with findings of fact, which [courts] review for clear error." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1157 (9th Cir. 2007). "[A] district court necessarily abuses its discretion when it bases its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (internal quotation marks omitted). *See also Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1374 (Fed. Cir. 2006) ("[Courts] will only overturn a

decision granting a preliminary injunction on appeal if 'the [district] court made a clear error of judgment in weighing relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings.'");

Pursuant to these standards, the District Court decision in this case cannot stand.

## B. The District Court Erred in Finding Likelihood of Success on the Merits

The challenged preliminary injunction is based on an erroneous finding that the Rearden Entities were likely to succeed in establishing that the transfer of the MOVA Assets from SHST to VGH should be set aside as a fraudulent transfer under the California Uniform Voidable Transactions Act ("CUVTA").

To succeed on the CUVTA counterclaim, the Rearden Entities must show (1) they have "a right to payment" from SHST; (2) that SHST transferred the MOVA Assets to VGH; (3) that SHST transferred the MOVA Assets "with the intent to hinder, delay or defraud one or more of its creditors;" (4) that they "were harmed;" and (5) that SHST's conduct "was a substantial factor in causing Defendants' harm."  *See* Judicial Council of California Civil Jury Instructions, No. 4200; Cal. Civ. Code §3439.04 (a).[11]

---

[11] Prior to January 1, 2016, this statute was referred to as the Uniform Fraudulent Transfer Act.

On a record devoid of evidence of harm suffered by the Rearden Entities as a result of the transfer from SHST to VGH, the District Court nonetheless concluded that the Rearden Entities were likely to prevail on the merits of their claim. This finding alone constitutes reversible error because an essential element of a claim under the CUVTA is that the allegedly fraudulent transfer harmed the creditor by putting an asset out of the creditor's reach. Here, the CUVTA claim is predicated on the assertion that the transfer from SHST to VGH put the MOVA Assets out of reach of the Rearden Entities. But the undisputed facts establish that the transfer did not change the status of the MOVA Assets. Ever since SHST acquired the MOVA Assets, they have been in the possession of exclusive licensee DD3 in California. The transfer to VGH did not change the fact that the assets are, and always have been, within reach of the Rearden Entities (and the District Court). On this basis alone, the Rearden Entities failed to establish a claim under the CUVTA.

The District Court also erred by failing to properly assess whether the Rearden Entities had a "right to payment" or that they were otherwise a "creditor" under the CUVTA, and further still by relying on so-called "badges of fraud" to infer fraudulent intent while disregarding evidence of actual intent showing a legitimate business objective for the transfer from SHST to VGH. The District

Court's finding of likelihood of success on the merits is thus unsupported by the

evidence and contrary to the law.

> ### 1. There Is No Evidence That the Rearden Entities Were Injured or Prejudiced by the Purportedly Fraudulent Transfer of the MOVA Assets from SHST to VGH
>
> > #### a. The MOVA Assets Were Never Beyond the Reach of the Rearden Entities or the District Court, but Always in the Possession of Non-Party Exclusive Licensee DD3

For a violation to occur, the Rearden Entities must have been injured by the

alleged fraudulent transfer. Such harm results when property is transferred *beyond*

*the reach of the creditor* to prevent satisfaction of the debt. *Mehrtash v. Mehrtash*,

93 Cal. App. 4th 75, 80 (2001). The California Court of Appeal put it succinctly:

> A well-established principle of the law of fraudulent transfers is, 'A transfer in fraud of creditors may be attacked only by one who is injured thereby. *Mere intent to delay or defraud is not sufficient; injury to the creditor must be shown affirmatively. In other words, prejudice to the plaintiff is essential. It cannot be said that a creditor has been injured unless the transfer puts beyond [her] reach property [she] otherwise would be able to subject to the payment of [her] debt.*' " (citations omitted)

*Mehrtash*, 93 Cal. App. 4th at 80 (emphasis added); *see also Fidelity Nat. Title Ins.*

*Co. v. Schroeder*, 179 Cal. App. 4th 834, 845 (2009) (reaffirming the

"longstanding principle that injury-in-fact is an essential element" of a claim under

the CUVTA); *Kelleher v. Kelleher,* 2015 WL 5693726, *11 (N.D. Cal. Sept. 29,

2015) (noting it is a "well-established principle of the law of fraudulent

24

transfers … that a transfer in fraud of creditors may be attacked only by one *who is injured* by the transfer." (quoting 8 Witkin, Cal. Proc., Enforcement of J. §497 (5th ed. 2008)) (quotations omitted) (emphasis added)).

SHST did not fraudulently transfer the MOVA Assets when it sold the property to VGH.  To the contrary, VGH *notified* the Rearden Entities of the transfer and substituted into the case pursuant to Fed. R. Civ. P. 25(c) as both the plaintiff (replacing SHST) and a counterclaim defendant, assuming SHST's liabilities with respect to this lawsuit as its successor in interest in accordance with the law.  *See, e.g.*, *Sunnyside Dev. Co., LLC v. Opsys Ltd.*, 2007 WL 2462142, *5 (N.D. Cal. Aug. 29, 2007) ("[S]uccessor liability is appropriate where the subject matter of the action has been transferred. . . .").  The MOVA Assets remained within the Rearden Entities' reach because the assets stayed exactly where they had been since 2013 − with DD3.  The Rearden Entities admitted as much in their CUVTA counterclaim:  "The purported transfer has not changed the possession of [sic] the control of the MOVA Assets which . . . remain with [SHST]'s purported exclusive licensee, DD3."  Appx 253 ¶428.

The District Court could not (and did not) find that the MOVA Assets were beyond the reach of the Rearden Entities.  And because "[a] creditor cannot premise a [CUVTA] claim on a transfer unless 'the transfer puts beyond [the creditor's] reach property [the creditor] otherwise would be subject to the payment

of [ ] debt'" (*Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1065 (N.D. Cal. 2014) (citation omitted)), the Rearden Entities cannot prevail on their fraudulent transfer charge. The District Court thus erred in concluding that the Rearden Entities are likely to succeed on the merits.

The District Court has in effect issued a restraint as a "penalty" based on perceived fraudulent intent inferred from SHST's disappearance from the case. That is improper and goes far beyond the CUVTA, which exists "to protect creditors by authorizing them to set aside transfers by which debtors try to avoid paying debts by putting assets beyond creditors' reach." *Renda v. Nevarez*, 223 Cal. App. 4th 1231, 1236 (2014). Courts applying California law have rejected the imposition of such a penalty when the property at issue is within reach or has been returned. *See, e.g., Hassen v. Jonas*, 373 F. 2d 880 (9th Cir. 1967). The *Hassen* court considered the imposition of a penalty on a bankruptcy debtor for the debtor's "alleged wrongful intent which attended his withdrawal of the money" under California's fraudulent transfer law. *Id*. at 883. The debtor had already restored the fraudulently transferred funds without harm to the creditors, and the *Hassen* court reversed because there was "no persuasive precedent for the imposition of such a penalty." *Id*. "Where the person responsible for the fraudulent transfer has himself remedied the situation by returning the transferred property, the statutory purpose has been satisfied." *Id. Accord Renda*, 223 Cal.

App. 4th at 1238 (CUVTA "does not impose on the debtor any liability additional to or distinct from the existing claim of the creditor; it simply allows the creditor to obtain '[a]voidance of the transfer … *to the extent necessary to satisfy the creditor's claim*.'" (quoting Cal. Civ. Code §3439.07(a)(1) (emphasis in original)).

Like the reversed court in *Hassen*, here the District Court imposed a "liability" beyond what is necessary to satisfy any creditor claim (assuming the Rearden Entities even have one). The transferred MOVA Assets are held by VGH (as successor in interest to SHST) and remain subject to the District Court's determination of ownership. Entering an injunction without a showing of injury under the CUVTA was clear error.

### b. The Rearden Entities Cannot Qualify as a Creditor under the California Uniform Voidable Transfer Act

The District Court committed further error by finding a likelihood of success on the merits despite the Rearden Entities having no counterclaims giving rise to a "right to payment" nor alternative status as a "creditor" arising from a properly cognizable ownership interest in the property. Appx10-11.[12]

Only creditors may seek relief under the CUVTA. Cal. Civ. Code §3439.04(a). A "creditor" is one who has "a right to payment." Cal. Civ. Code

---

[12] While the District Court did not conclude expressly that the Rearden Entities are a "creditor" for purposes of the CUVTA, its finding of likelihood of success on the merits is necessarily premised on this erroneous conclusion because creditor status is required under the statute.

§§3439.01(b)-(c).  Nowhere in the Order is there a finding that the Rearden

Entities would be entitled to monetary damages if successful on any of their

counterclaims.  Nor is there a finding that they are likely to succeed on any of

those counterclaims.  In short, not only did the Rearden Entities fail to establish

that they have a "right of payment" under the CUVTA (*See In re Blanchard,* 547

B.R. 347, 357-358 (Bankr. C.D. Cal. 2016) (entity failed to meet its burden to

prove that alleged breach of contract gave rise to a "right to payment" under the

CUVTA)), the District Court failed to even consider this essential element of a

CUVTA claim.  That was error.

Had the District Court made the inquiry and analysis, it would have been

forced to conclude that the Rearden Entities have no right to monetary relief.  The

reasons vary with the nature of each counterclaim.  As to the Rearden Entities' IP-

related charges for patent infringement, copyright infringement, trademark

infringement, and cybersquatting, there is no evidence that SHST or VGH – both

of which are holding companies without any operations – did anything which

violated the statute asserted or otherwise gave rise to any asserted misdeed (such as

to make, use, sell, or import an infringing device in violation of patent law).

Moreover, both SHST and VGH are foreign entities with no presence in the U.S.,

and the laws on which the Rearden Entities base their infringement charges have

no extraterritorial effect.  *See, e.g.*, *Microsoft Corp. v. AT&T Corp.,* 550 U.S. 437,

454-55 (2007) (U.S. patent law does not extend to foreign conduct); *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248 (1991) ("It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." (internal citations and quotations omitted)); *Litecubes, LLC, v. Northern Light Prod., Inc.*, 523 F.3d 1353, 1357 (Fed. Cir. 2008) (Allegedly infringing activity must be proven to have taken place in the United States to prevail on claims of patent or copyright infringement); *Ocean Garden, Inc. v. Marktrade Co., Inc.,* 953 F.2d 500, 503 (9th Cir. 1991) (the Lanham Act only applies when foreign activities giving rise to trademark infringement have an "effect on American foreign commerce…sufficiently great to present cognizable injury under the federal statute."). None of these laws can be stretched to cover overseas entities such as SHST or VGH which have done nothing in this country.[13]

As to the Rearden Entities' state law counterclaims, the reasons are more varied but the result is the same. First, the common law causes for conversion, trespass, intentional and negligent interference, and unfair competition are

---

[13] The District Court apparently believed in this regard that VGH was asserting lack of personal jurisdiction. Appx10. No such contention was made. Rather, the point is that SHST and VGH are both foreign based holding companies. Neither has operations of any sort in the United States, neither does anything beyond holding title to property, ***and*** neither comes within the proper limits of U.S. law. Thus, neither SHST nor VGH can be held liable for damages under any of Defendants' IP-based counterclaims.

preempted by the Rearden Entities' claim under the California Uniform Trade Secrets Act and possibly by one or more of the federal claims as well. *See, e.g.*, *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 232–42 (2010) and *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1213 (9th Cir. 1998) (section 17200 claims based on rights equivalent to those protected by federal law are preempted).  Several of these claims are also barred by the applicable statute of limitations (Cal. Code Civ. P. §339 (1)), and Cal. Bus. & Prof. Code §17200 has no extraterritorial effect. *Cannon v. Wells Fargo Bank*, 917 F. Supp. 2d 1025, 1055 (N.D. Cal. 2013).  As to the trade secret contention itself, there is and can be no evidence that SHST or VGH obtained or used any trade secret information. After SHST entered its transaction with Original MO2, all MOVA Assets went directly from Original MO2 to SHST's licensee, DD3.  As set forth above, the assets did not physically flow through SHST.  And finally, "there is no cause of action for unjust enrichment under California law." *In re iPhone Application Litigation*, 844 F. Supp. 2d 1040, 1075 (N.D. Cal. 2012).

Because they lack any legally tenable counterclaim, the Rearden Entities have no right to monetary relief and thus cannot qualify as a creditor under the CUVTA.

Moreover, the Rearden Entities' counterclaims all require a showing of ownership of the MOVA Assets.  Having failed on their motion for summary

judgment as to ownership, having made no argument that they can overcome the numerous other deficiencies with their position on ownership (most of which Judge Conti did not reach or decide), and having failed to introduce any theories other than those raised in their unsuccessful motion for summary judgment, Appx257 at 8:22-26, the Rearden Entities cannot demonstrate a likelihood of success on the merits in this regard either.

If the Rearden Entities cannot establish that they gained ownership of MOVA in February 2013, they cannot succeed in any of their counterclaims.  If they do not succeed in any of their counterclaims, they are not creditors of VGH. If they are not creditors, they have no claim under the CUVTA.  Because all counterclaims are predicated on ownership of the MOVA Assets, none has accrued and thus once more there is no "right of payment" under the CUVTA.  3 Witkin, Cal. Proc. 5th Actions §493 (2016) ("The cause of action ordinarily accrues when, under the substantive law, the wrongful act is done and *the obligation or liability arises . . .*") (emphasis added).

The Rearden Entities have not established ownership of the MOVA Assets – they may never do so.  The mere possibility that the Rearden Entities can obtain ownership does not equate with the strong likelihood of success on the merits of the charge which is required to support a preliminary injunction.

The District Court did not find that the Rearden Entities were likely to establish ownership of the MOVA Assets, nor did it even consider the issue in its Order.  The District Court cites to only one case, *Wimbledon Fund, SPC Class TT v. Graybox*, 2016 WL 1554271 (9th Cir. April 18, 2016).  Appx11.  *Wimbledon,* however, has no bearing on whether the Rearden Entities are likely to show that they are a creditor.

In *Wimbledon*, the plaintiff alleged that it had entrusted its funds to defendant, who had mismanaged and fraudulently transferred them.  *See Wimbledon Fund, SPC v. Graybox, L.L.C.*, 2015 WL 5822580, at *1 (C.D. Cal. September 29, 2015).  There was no question that the allegedly mismanaged funds belonged to the plaintiff.  The plaintiff sought an injunction freezing other assets (the defendant had already transferred plaintiff's original funds).  Indeed, the defendant **admitted** that it intended to dissipate those other assets.  *Id.* at *2.  The district court granted the preliminary injunction freezing those assets and the Ninth Circuit affirmed.

Unlike here, the parties in *Wimbledon* did not dispute that the plaintiff was a creditor of the defendant.  For example, there was no allegation that the mismanaged funds had never belonged to the plaintiff or that there was no debt for the defendant to avoid.  Because the *Wimbledon* court was not faced with such allegations, it therefore did not address the question of whether the movant was a

32

potential creditor of the alleged defrauder and thus does not stand for the error

relied upon by the District Court here – that a preliminary injunction on a claim of

fraudulent transfer is proper despite no likelihood of success in establishing that

the movant is a creditor. *Wimbledon* merely reinforces a standard fraudulent

transfer concept that VGH does not dispute: recovery under the CUVTA is not

necessarily limited to recovery of the actual assets originally owned by the

creditor.  Here, however, in order to succeed in their fraudulent transfer claim, the

Rearden Entities must demonstrate that they own the MOVA Assets (otherwise, as

explained above, they have no basis to allege that they are creditors of VGH).  But

the District Court did not find that the Rearden Entities had established a likelihood

of success in proving that ownership.

District Court therefore erred: it excused the Rearden Entities from the

requirement that they demonstrate likelihood of success on their ownership claim.

Without such success, the Rearden Entities do not qualify as a "creditor" under the

CUVTA by virtue of either a right to payment or a right to property.

## 2. The District Court Erred in Finding That Title to the MOVA Assets was Transferred with Intent to Hinder, Delay, or Defraud

Beyond lack of injury or prejudice, the District Court failed to properly

acknowledge and assess actual intent underlying the transfer of the MOVA Assets.

Because "badges of fraud" are aids in *inferring* intent, evidence of a party's *actual*

intent negates such suggestions.  *See In re Beverly*, 374 B.R. 221, 236 (B.A.P. 9th Cir. 2007), *aff'd in part, dismissed in part,* 551 F.3d 1092 (9th Cir. 2008) ("[S]pecific evidence may negate an inference of fraud notwithstanding the presence of a number of 'badges of fraud.'").  Indeed, a party wishing to hide assets (allegedly SHST) would not transfer them to an entity (VGH) within the same corporate family as the exclusive licensee in possession of the property (DD3), much less to a transferee (VGH) which voluntarily submits to the District Court's jurisdiction.  Transferees in cases subject to the CUVTA hide assets; they do not substitute into cases where ownership of the property is already in dispute.

Despite the actual intent apparent from these undisputed facts, the District Court summarily concluded that VGH does not offer "significantly clear evidence of a legitimate supervening purpose."  Appx15 at 12:13-17.  In making this statement, however, it also ignored the further record on the subject.  Transfer of MOVA from SHST to VGH was intended to place title within the same corporate family as exclusive licensee DD3, not to hide the assets for SHST's benefit.  That was and is sufficient justification, particularly insofar as there is no support in the law for the District Court's ill-conceived notion that it was VGH's burden to show proper purpose by what seems to be a "clear and convincing" standard.  The California Legislature has stated that a "court should evaluate *all the relevant circumstances* involving a challenged transfer and may appropriately take into

account *all indicia negativing* as well as those suggesting fraud." *Annod Corp. v. Hamilton & Samuels,* 100 Cal. App. 4th 1286, 1298 (2002) (emphasis added); *see also In re Beverly*, 374 B.R. at 236. The District Court did not follow this directive.

Additionally, VGH's conduct was consistent with a legitimate business purpose of maintaining the MOVA Assets and seeking a judicial determination of ownership. *See In re Cushman Bakery*, 526 F. 2d 23, 32-33 (1st Cir. 1975) (debtor acquiescence in concealing preferred payment to one creditor did not make the transfer fraudulent because the arrangement served a legitimate purpose and was consistent with business practices, served the business interests of both parties and was not intended to prejudice other creditors). The District Court's failure to consider this further evidence of legitimate purpose for the transfer of assets was error as well. *See Americans for Prosperity Found. v. Harris*, 809 F.3d 536, 539 (9th Cir. 2015) (abuse of discretion when "district court's factual determination is illogical, implausible or lacks support in inferences that may be drawn from facts in the record.")

The District Court's assessment of "badges of fraud" does not undermine the conclusion that the transfer from SHST to VGH did not violate the CUVTA given the evidence of actual intent. *Wyzard v. Goller*, 23 Cal. App. 4th 1183, 1190 (1994) (the presence of one or more badges of fraud does not create a presumption

35

of fraud). Its finding, for example, that "SHST concealed the transfer" is

nonsensical and contradicted by all the evidence. Cal. Civ. Code §3439.04(b)(3).

Appx11. Neither SHST nor transferee VGH took steps to hide the assets (or even

to use them). Location and use of the MOVA Assets remained with DD3, and

***VGH stepped into the lawsuit as a plaintiff and counterclaim defendant.*** This is

diametrically opposed to the common fraudulent transfer scenario where a business

or individual, after being threatened or sued, diverts all of what it has into a

difficult or impossible to find – let alone pursue – foreign account or foreign entity.

Similarly, the District Court's focus on VGH acquiring title to the MOVA

Assets from SHST while not expressly assuming liabilities was also misplaced.

*See* Appx10. As a matter of substantive law, successors in interest are bound

where the subject matter of a pending action is transferred. *See In re Bernal*, 207

F.3d 595, 598 (9th Cir. 2000) ("The action may be continued by or against the

original party, and the judgment will be binding on his successor in interest even

though he is not named." (quoting 7A Wright and Miller, Federal Practice and

Procedure § 1958 (2d ed. 1986)). *See also Sunnyside Dev. Co., LLC*, 2007 WL

2462142, at *5). Here, the MOVA Assets were the subject matter of a pending

action. As a result, VGH was and remains bound, notwithstanding the contractual

disclaimer, and the asset transfer did not and could not prejudice the Rearden

Entities because they can recover the property from VGH if they prevail on the

36

merits. What might otherwise appear to be an avoidance strategy is not, under the law, and the "badge" therefore should not have been interpreted by the District Court as evidencing ill intent for that reason.

In finding "fraud," the District Court also placed unjustified weight on the timing of the transfer and the timing of notice to the Rearden Entities. Appx14 at 11:17-21. When viewed in the context, the fact that the transfer occurred in the middle of December 2015 does not point to fraudulent intent. There was nothing nefarious: DDHL was considering the transfer of title months before the Rearden Entities were granted leave to file new counterclaims, Appx329 ¶7, but it would have made no sense to move forward with the sale while the Rearden Entities' potentially dispositive summary judgment was pending and could have resulted in a determination that SHST did not even own MOVA. Following the summary judgment order, negotiating, documenting, and ultimately executing transfer of title from SHST to VGH took two months and closed, as many corporate deals do, before the end of the calendar year. (*Id*.) The transaction had its own momentum. It was not driven by the Rearden Entities' new counterclaims, which were not even raised as a possibility until the first part of December 2015 and which by nothing more than happenstance were first allowed one day prior to closing. All of the evidence in the record thus negates the District Court's conclusion that the timing

of the transfer "indicates that it was made to avoid liability."  Appx14 at 11:15-16. *See Annod Corp.,* 100 Cal. App. 4th at 1298.

The fact that "SHST did not reveal the transfer for over two months after its occurrence and continued to act as the Plaintiff in the case," Appx14 at 11:18-19, similarly does not overcome evidence of actual intent.  Because "…Rule 25(c) is wholly permissive there is no time limit on moving to substitute under its provisions."  7A Wright and Miller, Federal Practice and Procedure § 1958 (2d ed. 1986).  The case law is replete with instances of delay far longer than the two months.  *See, e.g.*, *Gen. Battery Corp. v. Globe-Union, Inc*., 100 F.R.D. 258, 259 (D. Del. 1982) (*years* passed before notice of several transfers and substitution). And more importantly, ***VGH notified the Rearden Entities of the transfer of its own accord and made no effort to conceal what had occurred***.  The Rearden Entities did not point to any intervening harm arising during the pending two months, and the District Court did not make any such finding either.

Also, and contrary to the District Court's observation, "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred."  *See* Appx14.  Although SHST paid $100,000 to purchase the assets, those funds were provided by DD3's parent company.  When SHST transferred title to VGH, the parent, on behalf of VGH, made an up-front payment of $50,000.  As a result, SHST received $50,000

in exchange for accommodating the DDHL corporate family by holding title to MOVA for just over three years. The District Court did not cite (nor did the Rearden Entities supply) evidence to suggest that this was not reasonably equivalent value. And certainly in light of what Rearden CEO Perlman said on the subject prior to SHST's February 2013 purchase – that MOVA was worth $1 – receipt of $50,000 in exchange for holding title does not translate to a "badge of fraud." *See Annod Corp.,* 100 Cal. App. 4th at 1299 (no triable issue of material fact on intent when circumstances showed that transfers to insiders were payments made in good faith for fair value).

The District Court also found that SHST transferred substantially all of its assets. Appx15. But this is irrelevant because DD3 – not SHST – is the only entity that possessed and used the MOVA Assets and thus the only entity theoretically exposed to liability arising from those activities.

VGH also is not an "insider" within the meaning of Cal. Civ. Code §3439.04(b) (1). The District Court's acceptance of the Rearden Entities' claim that VGH can exert control or influence over SHST, and that "SHST shares a common ownership and management with DDHL" was unwarranted and without evidentiary support. Appx13 at 10:16-17. At best, the Rearden Entities offered and the District Court acted on speculation, as the record demonstrates that SHST does ***not*** share common ownership or management with DDHL (the two are

wholly separate).  Appx329 ¶7.  Moreover, events in this case demonstrate that VGH cannot exert control or influence over SHST.  If, for example, VGH had influence or control over SHST, VGH would have used that power to obtain cooperation from SHST in discovery, which would have avoided the motion practice leading to the injunction in the first place.

In the final analysis, nothing in the record or in the District Court's findings detracts from the conclusion that when SHST and VGH agreed to transfer title – but in the process did ***nothing*** to impair or jeopardize rights which the Rearden Entities *might* have or the availability of remedies to which they *might* be entitled – there was no intent to hinder, delay, or defraud.

### C. The District Court Erred in Finding Likelihood of Irreparable Harm

A movant "seeking preliminary relief … [must] demonstrate that irreparable injury is ***likely*** in the absence of an injunction."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (original emphasis).  A preliminary injunction "will not be issued simply to prevent the possibility of some remote future injury."  *Id.*  The District Court did not adhere to this standard in its analysis or decision.

### 1. The Rearden Entities Were Dilatory in Requesting an Injunction

Delay "for a substantial period of time before seeking a preliminary injunction at least suggests that the status quo does not irreparably damage" the

movant.  *Nutrition 21 v. United States*, 930 F.2d 867, 872 (Fed. Cir. 1991).  *See also Oakland Tribune, Inc. v. Chronicle Publ. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (Delay "implies a lack of urgency and irreparable harm.").

In its Order, the District Court determined that the Rearden Entities did not delay because they brought their motion "[w]ithin four days of learning that SHST ceased participating in the case."  Appx16 at 13:1-3.  That, however, is the wrong frame of reference.  The Rearden Entities knew for *three years* that DD3 was using the MOVA Assets and that a foreign entity was involved in the acquisition from Original MO2.  As of 2013, the Rearden Entities thus had a ripe ownership claim and the right to sue (or arbitrate) to obtain possession.  They consciously decided not to advance this right.  If there was genuine concern that the property could be dissipated, lost, or hidden, the Rearden Entities would have acted much earlier.  That they did not do so indicates lack of urgency which contradicts any assertion of irreparable harm.  By ignoring the Rearden Entities' long delay, the District Court's analysis was incomplete if not clearly erroneous.

## 2. The District Court Erred in Determining That the Rearden Entities Established a Likelihood of Dissipation of Assets.

"A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted."  *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009).  Unsupported, speculative, or conclusory statements regarding harm that a party

*might* suffer are not enough. *Herb Reed Ent., LLC v. Fl. Ent.*, 736 F.3d 1239, 1250

(9th Cir. 2013) ("district court abused its discretion by relying on 'unsupported and

conclusory statements regarding harm [the party] *might* suffer'" (original

emphasis)); *see also Caribbean Marine Serv. Co. v. Baldridge,* 844 F.2d 668, 674

(9th Cir. 1988) ("[s]peculative injury does not constitute irreparable injury

sufficient to warrant granting a preliminary injunction"); *Am. Passage Media*

*Corp. v. Cass Communications, Inc.,* 750 F.2d 1470, 1473 (9th Cir. 1985)

(irreparable harm not established by statements that "are conclusory and without

sufficient support in facts").  Here, the assertions and "evidence" on which the

Court relied in finding a likelihood of dissipation of assets (and thus irreparable

harm) were not sufficient to justify the relief it granted.

### a. The Rearden Entities Admit That the Few Items of Hardware Which They Claim Were Discarded Had Little or No Value and Were Fungible; DD3 Replaced Those Items

The District Court found that the Rearden Entities "have shown a likelihood

of dissipation of the claimed assets and that they would suffer from irreparable

harm as a result."  Appx16 at 13:20-21.  The "claimed assets" are the physical

components of MOVA, all of which were (until the injunction) in the sole

possession of DD3, which used them exclusively on a continuous basis since 2013.

The District Court referenced only one item of evidence detailing supposed

dissipation of physical MOVA Assets: a list of twelve hardware components which

had been discarded over the course of several years of use. These were a camera, several laptop computers and PCs, a hard drive and an internal drive, and flow ballasts. Appx16 at 13:12-19.[14] However, even if all such items were discarded, that did not and does not establish "dissipation" for several reasons.

First, contrary to the Rearden Entities' speculation on which the District Court apparently relied, DD3 replaced components in order to be able to continue to provide services to its customers. DD3 had to do so because MOVA would not work if a single light, camera, or computer was not functioning properly (and MOVA of course worked better and faster with more up-to-date computers as opposed to the 2006 devices obtained from Original MO2).

Second, each of the discarded components was fungible, and there is no evidence that replacement diminished the overall value of the MOVA Assets. This includes the Balser A102f camera which the Rearden Entities asserted – without support – was "irreplaceable." An exact replacement can be found and purchased over the Internet. *See, e.g.*,

http://www.plccenter.com/Buy/BASLER%20ELECTRIC/

A102F and http://www.aegis-elec.com/basler-a102f-fc.html. The District Court's

---

[14] "Ballast" in this context is electrical circuitry used to control a lamp, here a florescent bulb, for example to turn it on and control the illumination provided. *See* http://www.lrc.rpi.edu/programs/nlpip/ lightinganswers/adaptableballasts/ballast.asp.

reliance on the Rearden Entities' conclusory and mistaken assertions in this regard was clear error.  Appx16 at 13:12-21.

Third, the District Court ignored uncontradicted admissions that none of the twelve discarded hardware components had value.  According to Perlman, as of 2012 and 2013 the circa 2006 computers were worthless, non-HD cameras were outdated, and florescent lights needed to be upgraded to LED technology.  And lest there be any doubt, the "irreplaceable" Balser A102f was not a high definition device but rather – as even Perlman acknowledged (as quoted above) – a low-definition (1.4 megapixel) digital camera.  *See* http://www.aegis-elec.com/basler-a102f-fc.html.[15]

Further still, the District Court did not acknowledge or apparently consider the fact that prior to February 2013 – the relevant date for these purposes – Perlman had also averred that the value of the entirety of MOVA – not just the physical components – was one dollar, that restoring MOVA to a viable business required an R&D investment, and that successful use of the technology required the labor and skills of LaSalle and Pearce.

---

[15] By contrast, cameras in modern smartphones are 12 or more times more powerful.  *See* http://www.apple.com/iphone-6s/specs/ (12 megapixel camera in iPhone 6s); http://www.gsmarena.com/samsung_galaxy _s6_edge-7079.php (16 megapixel camera in Samsung Galaxy S6 Edge).

And fourth, the District Court seemingly did not consider that DD3 made the outlays – not merely to buy equipment but to bolster all other aspects of the MOVA business – necessary to revive what was in 2013 a fully depreciated property. Those contributions by DD3 (involving expenditure of as much as $500,000) likely enhanced asset value. But even if this significant investment did not increase value, the evidence which the District Court ignored demonstrates at the very least that there was no dissipation under DD3's stewardship.

### b. The Acts and Omissions of SHST on which the District Court Based its Finding Did Not Relate To, Much Less Cause, the Supposed Dissipation

The remaining evidence on which the District Court relied to find "likelihood of dissipation of the claimed assets" does not concern possession, disposal, or use of the property at all. Instead, the District Court pointed again (in penal fashion) to SHST: the timing of SHST's transfer of ownership to VGH "immediately after the District Court granted the Rearden Entities' request to amend counterclaims," SHST's subsequent non-responsiveness to discovery, and SHST's supposed retention of liabilities. Appx16 at 13:4-12. Although SHST's behavior may not be commendable, none of this relates legally or logically to threat of loss of or damage to any MOVA Assets.

When SHST transferred title to MOVA to VGH, there was no change in possession or use of the property. Irrespective of the timing of the District Court's

order granting the Rearden Entities leave to amend their counterclaims, the physical assets remained with and continued to be used by DD3. And there is no evidence that the District Court's decision to allow new counterclaims prompted SHST to transfer title.

There is likewise no evidence that SHST becoming non-responsive to discovery bore any relationship to possession or use of the property. Again, the physical assets remained with and continued to be used by DD3. And because DD3 had a fully paid, exclusive, perpetual license, whether SHST continued to participate in discovery could have no bearing on the location or condition of the assets at issue.

By the same token, there is and can be no connection between SHST retaining liability and any actual or perceived need to protect the property. Title was transferred to VGH. That left SHST – whether it bore continued liability or not – without power or authority (if it ever had such ability in the first place given license terms with DD3) to dissipate or secret MOVA. The District Court therefore erred in determining that this factor, along with the others it recited concerning SHST, "weigh[ed] in favor of finding that Defendants would suffer irreparably [sic] harm" absent the injunction. Appx16 at 13:4-5.

Speaking more broadly, there is also insufficient causal connection between any aspect of supposed generalized wrongdoing by SHST and any potential harm

to the Rearden Entities. *Cf. Apple v. Samsung,* 695 F.3d 1370, 1374 (Fed. Cir. 2012) (to satisfy the irreparable harm factor in a patent infringement suit, the patentee "must establish . . . that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement"). The Rearden Entities' contention that they will be injured unless DD3 stops using MOVA (which DD3 has done since 2013) because SHST engaged in a purportedly fraudulent transfer of title in 2015 is speculative, and thus not sufficient to demonstrate the likelihood of irreparable harm required to justify injunctive relief. *See, e.g.*, *Am. Passage Media Corp.*, 750 F. 2d at 1473.

### c. The District Court Failed to Consider the Fact that VGH and Exclusive licensee DD3 Have Assured the Integrity and Availability of the MOVA Assets

The District Court erred further by ignoring VGH's role as successor in interest to SHST, instead focusing on and agreeing with the Rearden Entities' argument that "SHST's conduct to date indicates a threat of irreparable harm." Appx16 at 13:10-11. The Rearden Entities will *not* be irreparably harmed by the purportedly fraudulent transfer to VGH absent an injunction because the Rearden Entities can recover from VGH if they prevail on their counterclaims. VGH substituted for SHST as Plaintiff in this case, and voluntarily became a Counterclaim Defendant subject to any recovery. After VGH obtained title, it did nothing to impair the assets. DD3's exclusive, perpetual license remained in force

unchanged.  And the Rearden Entities presented no evidence that VGH intended to do anything different from what SHST had done for three years – remain an entirely passive licensor with no involvement in the manner in which MOVA was used.

The District Court also failed to consider the fact that the MOVA physical assets have remained in the exclusive possession of DD3 since 2013.  Although SHST and VGH are overseas holding companies, there is no evidence that either ever attempted to transfer any portion of the property elsewhere.  And even if SHST or VGH had the power (which was not retained by either pursuant to the licensing arrangement with DD3) to take possession and move the property, doing so would make no sense.  The MOVA Assets are used mainly to provide services to the Hollywood film industry, not to provide services to others based in distant locations where demand does not exist.  The District Court abused its discretion by relying on unwarranted assumptions and unsupported conclusory statements concerning harm which the Rearden Entities *might* suffer absent restraint.  *Herb Reed Enterprises*, 736 F.3d at 1250.

### D. The District Court Erred in Finding That the Balance of Equities Weighs in Favor of Injunctive Relief and That an Injunction Serves the Public Interest

#### 1. The Balance of the Equities Tips Against an Injunction

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

The District Court found correctly that there was no harm imposed directly on licensor VGH. Appx17 at 14:2-5. But that does not end the analysis. The District Court held explicitly that the preliminary injunction should apply to exclusive licensee DD3. Appx16-17. And while it recognized that the consequence would be injury to DD3, it declined to account for this impact because DD3 was not a named party. Appx17-18 at 14:22-15:6. This was further error.

A far more compelling showing of likely success on the merits and of probable irreparable harm than made here (if any at all) is necessary to support an injunction which has the effect of shutting down a business. *See, e.g., Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F. 2d 679, 683-84 (Fed. Cir. 1990) (affirming denial of preliminary injunction which would prohibit competitor from manufacturing and selling its product); *Open Text, S.A. v. Box, Inc.*, 36 F. Supp. 3d 885, 910 (N.D. Cal. 2014) (denying preliminary injunction that would require

defendant to cease marketing a product because "the hardship on a preliminary enjoined party who is required to withdraw its product from the market before trial can be devastating."); *Lilith Games (Shanghai) Co. v. UCool, Inc*., 2015 WL 5591612, at \*12 (N.D. Cal. September 23, 2015) (denying video game developer's motion for preliminary injunction to prohibit competitor from selling its most popular game).

The preliminary injunction prevents DD3 from operating at least a part of its business. When compared to the conjectural hardship that the Rearden Entities espoused, the balance can come out only one way. There is no authority which justifies failure or refusal to account for the impact on a closely affiliated non-party when a court not only knows but intends that its injunction will stop that non-party in its tracks. Nor is it proper for a court to do so. This factor calls for a balancing of the *equities*, and the District Court in this instance was wrong in applying the test as narrowly as it did. Properly conceived, the balance here militates against issuing an injunction against VGH which would apply to its exclusive licensee DD3.

## 2. The Preliminary Injunction Does Not Serve the Public Interest

Although the District Court identified the harm to DD3 and to the general public resulting from the preliminary injunction as pertinent factors bearing upon this issue, Appx14, it failed as a matter of law to account properly for them. The

District Court's error was to posit two countervailing factors, deterrence and harm to the Rearden Entities, as having more significant force.

First, deterrence – or as the District Court put it, "discouraging fraudulent conveyances" (*id.*) – is not a public interest factor. That is because the "*sole purpose* of a preliminary injunction is to preserve the status quo ante litem *pending a determination of the action on the merits.*" *Sierra Forest Legacy*, 577 F.3d at 1023 (internal quotation marks omitted) (emphasis added). Preliminary injunctions are not meant to punish or deter, because the court has not reached a decision on the merits.

Second, it is error to deem availability of adequate relief to be a public interest factor. The District Court already accounted for adequacy of relief in evaluating likelihood of irreparable harm. Double counting eviscerates consideration of the public interest and distorts the *four*-factor balancing test.

Harm to DD3 and to the general public stand alone, and cannot be discounted in the manner which occurred here. Because the preliminary injunction does not serve the public interest, the District Court erred as a matter of law.

### E. The Injunction is Impermissibly Broad Because It Bars Not Just Transfer, But Long-Standing Use of the MOVA Assets by Non-Party Exclusive Licensee DD3, Impairing the Value of the Very Property It Seeks to Protect

Even if injunctive relief were proper, the District Court committed error by barring continued use of the MOVA Assets. "An overb[roa]d injunction is an

51

abuse of discretion." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011) (internal quotation marks omitted). In this instance, the District Court did not narrowly frame the injunction and went beyond preserving the status quo. The restraint should therefore be vacated or modified.

### 1. The Use Restriction Is Not Narrowly Tailored to Remedy the Alleged Harm

"[I]njunctive relief . . . must be tailored to remedy the *specific harm alleged.*" *Park Vill.*, 636 F.3d at 1160 (internal quotation marks omitted); *accord Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S. Ct. 2545, 2558 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."); *Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007). In this case, the District Court identified the alleged harm as the Rearden Entities "being left with no remedy as a result of SHST's fraudulent transfer." Appx17 at 14:7. Specifically, "SHST transferred its assets but retained its liabilities, rendering it incapable of satisfying any judgment." Appx16 at 13:11-12. But the District Court failed to articulate how barring use addresses this harm. *See Nat. Res. Def. Council*, 508 F.3d at 886 (vacating injunction where the "district court did not explain why a broad, absolute injunction against the use of the medium frequency active sonar . . . was necessary to avoid irreparable harm to the environment." Nor could it do so.

There is no connection in terms of possible harm measured in dollars.  The District Court did not even indicate that the Rearden Entities might be entitled to damages.  And the Rearden Entities did not argue and cannot demonstrate a right to monetary recovery on any of their counterclaims.  But even if dollars were at stake, *halting* DD3's ongoing use of MOVA – productive use for which film industry customers would pay – does not make it more likely that SHST (or anyone else) would be able to satisfy a judgment.  Cutting off a flow of revenue has the opposite effect.

As to the potential for harm to the Rearden Entities' claimed possessory interest, that too is not reduced or avoided by a prohibition against use.  The assets remain before the District Court, and any decision as to ownership would bind transferee VGH.  *See In re Bernal*, 207 F.3d at 598 ("[The transferee] was bound by what had gone on before.").  DD3 possessed and used MOVA for years before this suit arose and continued to do so following the transfer of title to VGH.  DD3 would relinquish the assets if the Rearden Entities establish ownership, providing a complete remedy with regard to the property.  In other words, the use restriction is superfluous.

The only possible justification for barring continued use of MOVA is implicit in the District Court's order and rests upon DD3's "disposal" of some equipment.  Appx13.  As set forth above, however, none of what occurred with the

53

twelve items of fungible hardware involved was "dissipation."  And even if replacement of worn or non-functioning equipment were a legitimate concern, only a more narrowly tailored response would be appropriate – for example, requiring the retention of outdated items that are replaced and preventing them from being discarded.  *See Califano,* 442 U.S. at 702.  Such a properly focused restriction, as opposed to an outright prohibition on use, would afford complete relief to the Rearden Entities without imposing unnecessary burdens on VGH and its exclusive licensee DD3.

## 2.  The Use Restriction Does Not Maintain the Status Quo

"The sole purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits."  *Sierra Forest Legacy*, 577 F.3d at 1023 (internal quotation marks omitted).  The District Court never clearly identified the last uncontested state of affairs pertinent to this dispute.  There are only two possibilities:  (1) the state of affairs following May 2013, after DD3 obtained possession and exclusive right to use the property and then the Rearden Entities made a conscious decision to not pursue their ownership claim, or (2) the state of affairs which existed immediately prior to the 2015 transfer to VGH.  In either instance, the status quo was that DD3 possessed and used the MOVA Assets to deliver facial motion capture services to its customers.  At a minimum, the restriction on use should be vacated because it goes beyond

maintaining the status quo.  *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).

### 3.  The Injunction Should Be Modified to Allow Use

When an injunction is overbroad, particular provisions can be vacated or modified.  *See Park Vill.*, 636 F.3d at 1163 (vacating section of the injunction); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297-98 (9th Cir. 1992) (modifying injunction); *United States v. BNS Inc.*, 858 F.2d 456, 466 (9th Cir. 1988) (same).  That approach would be appropriate here given the minimal changes needed to correct overbreadth.  Specifically, the use prohibition and corresponding sequestration directive imposed by the District Court should be removed.

### 4.  Absent Modification, the Value of the MOVA Assets will be Diminished Or Destroyed

The injunction prohibits all productive use of MOVA.  Appx428 ¶11.  It prevents exclusive licensee DD3 from completing work for its clients and disrupts a valuable business.  Appx430-431 ¶17.  It also prevents DD3 from continuing to build the MOVA brand, and from maintaining and upgrading the property.  *See* Appx427 ¶9.  As a result, the injunction does not preserve the MOVA Assets, it wastes them.  Appx430-431 ¶17.  If the injunction remains as issued by the District Court, MOVA will end up in the technology dustbin next to the 8-track cassette player.

55

## VI.    CONCLUSION

The District Court's preliminary injunction is unnecessary, unjustified, and harmful, and for these reasons cannot be allowed to stand.  VGH respectfully requests this Court to lift the preliminary injunction or remand with an order that it be lifted.

Dated:  June 27, 2017

/s/ Jon Michaelson
Jon Michaelson
Kilpatrick Townsend & Stockton LLP
1080 Marsh Road
Menlo Park, CA  94025
Telephone: 650-326-2400
Facsimile:  650-326-2422

Attorneys for Plaintiff-Appellant
VIRTUE GLOBAL HOLDINGS LIMITED

**ADDENDUM**

# ADDENDUM

# TABLE OF CONTENTS

| Docket Entry | Description | Page |
|---|---|---|
| 243 | Order Denying Motion for Reconsideration<br>Filed July 15, 2016 | Appx1-3 |
| 188 | Order Granting Motion for Preliminary Injunction<br>Filed June 17, 2016 | Appx4-19 |

1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    VIRTUE GLOBAL HOLDINGS LIMITED,          Case No. 15-cv-00797-JST

          Plaintiff,

8
                                              **ORDER DENYING DIGITAL DOMAIN**
9         v.                                  **3.0, INC.'S MOTION TO MODIFY THE**
                                              **PRELIMINARY INJUNCTION ORDER**
     REARDEN LLC, et al.,                     **AND VIRTUE GLOBAL HOLDINGS**
10                                            **LIMITED'S MOTION TO STAY OR**
          Defendants.                         **MODIFY THE PRELIMINARY**
11                                            **INJUNCTION PENDING APPEAL**

12                                            Re: Dkt. Nos. 206, 208

13

14        Before the Court is non-party Digital Domain 3.0, Inc.'s ("DD3") motion to modify the

15   preliminary injunction order and Plaintiff Virtue Global Holdings Limited's ("VGH") motion to

16   modify or stay the preliminary injunction order pending appeal. See ECF Nos. 206, 208. DD3

17   and VGH request that the Court make three modifications to the preliminary injunction order: (1)

18   remove the restriction that enjoins them from "using" the MOVA assets, (2) remove the transfer

19   requirement, and (3) substitute those requirements with less restrictive provisions. See ECF No.

20   206 at 8; ECF No. 208 at 7-8, 18. The Court denies both motions because it lacks jurisdiction.

21        Because a notice of appeal has been filed, this Court's jurisdiction to suspend or modify

22   the preliminary injunction is limited. See Nat. Res. Def. Council, Inc. v. Sw. Marine Inc., 242

23   F.3d 1163, 1166 (9th Cir. 2001); ECF No. 195. The Court may suspend or modify the preliminary

24   injunction only to preserve the status quo established by the preliminary injunction order or to

25   secure the opposing party's rights. See id. ("The district court retains jurisdiction during the

26   pendency of an appeal to act to preserve the status quo."); Fed. R. Civ. P. 62(c) ("While an appeal

27   is pending from an interlocutory order or final judgment that grants, dissolves, or denies an

28   injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or

1    other terms that secure the opposing party's rights."). For example, a district court has jurisdiction

2    to modify a preliminary injunction pending appeal to clarify the requirements imposed by, and to

3    ensure compliance with, the original preliminary injunction order. See, e.g., Nat. Res. Def.

4    Council, Inc., 242 F.3d at 1166-67 (holding that the modifications "were minor adjustments that

5    effectuated the underlying purposes of the original requirements" and therefore "[t]hese

6    modifications did not materially alter the status of the consolidated appeal"). However, a district

7    court does not have jurisdiction to remove restrictions imposed on the appealing party pending

8    appeal. See, e.g., Small v. Operative Plasterers' & Cement Masons' Int'l Ass'n Local 200, AFL-

9    CIO, 611 F.3d 483, 495 (9th Cir. 2010) (holding that the district court lacked jurisdiction to delete

10   a paragraph of the preliminary injunction order that imposed restrictions on the party appealing the

11   preliminary injunction).

12          Applying the foregoing rules to the motions at hand, this Court lacks jurisdiction to stay

13   the injunction or make the requested modifications because doing so would materially alter the

14   status of the case on appeal. The modifications requested by VGH and DD3 would not maintain

15   the status quo established by this Court's preliminary injunction order. Rather, as in Small, these

16   modifications would alter the status quo by removing the use prohibition and transfer requirements

17   imposed on VGH and DD3 by this Court's preliminary injunction order. See ECF No. 188 at 15-

18   16. Nor would these modifications secure Rearden's rights as the opposing party. Because the

19   Court lacks jurisdiction to remove the use and transfer provisions, it also declines to substitute

20   those provisions with the less restrictive provisions proposed by DD3.

21          VGH cites LifeScan, Inc. v. Shasta Techs., LLC as an example of a case where this Court

22   has modified a preliminary injunction pending appeal. See ECF No. 220 at 4. That case is

23   inapposite, however, because the modifications to the preliminary injunction were adopted

24   pursuant to stipulation. See LifeScan, Inc. v. Shasta Techs., LLC, No. 12-CV-06360-JST, 2013

25   WL 3200629, at *2 (N.D. Cal. June 24, 2013) (explaining that the opposing party "request[ed] that

26   the Court modify the injunction to explicitly permit the use of their logos or trade dress so long as

27   ///

28   ///

United States District Court
Northern District of California

2

APPX2

1  any such use complies with the nominative fair use test"). Thus, unlike in the present case, it was

2  clear that the opposing party's rights were not adversely affected by the modifications.

3       IT IS SO ORDERED.

4  Dated: July 15, 2016

5

6                          JON S. TIGAR

                    United States District Judge

United States District Court
Northern District of California

3

APPX3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRTUE GLOBAL HOLDINGS LIMITED,<br><br>         Plaintiff,<br><br>      v.<br><br>REARDEN LLC, et al.,<br><br>         Defendants. | Case No.  15-cv-00797-JST<br><br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: ECF No. 139 |

Defendants seek a preliminary injunction enjoining Plaintiff Virtue Global Holdings Limited and Plaintiff's licensees from using the physical MOVA Assets; securing the MOVA Assets in a neutral location; ceasing all use of the MOVA Assets patented technology, trademarks and copyrighted material, and derivative works thereof; and prohibiting Shenzhenshi Haitiecheng Science and Technology Co., Ltd. and Virtue Global Holdings Limited from any further transfer of the MOVA Assets to any other party. ECF No. 139.

The Court will grant Defendants' motion for a preliminary injunction.

## I.    BACKGROUND

This case is about the ownership of MOVA, a technology to "capture the facial performance of an actor" for use in movies, computer graphics, and other video applications, and its related intellectual property (collectively the "MOVA Assets"). See ECF No. 93 ¶ 9. Greg LaSalle and Stephen Perlman, former business collaborators and friends, are the principal actors in this dispute.

Much of the background of this case has been recited in the Court's prior orders and need not be repeated here. See ECF No. 52 (Order on Defendants' Motion for Summary Judgment); ECF No. 103 (Order on Discovery Letter Brief). The Court, however, provides the following background for the purposes of resolving this motion.

United States District Court
Northern District of California

APPX4

United States District Court
Northern District of California

## A.    Procedural History

Shenzhenshi Haitiecheng Science and Technology Co., Ltd. ("SHST") filed its Complaint in February 2015, seeking declaratory relief that it was the owner of the MOVA Assets. See ECF No. 1.

On December 16, 2015, at the parties' Case Management Conference, the Court granted Defendants' request to amend their pleadings and to file counterclaims. See ECF No. 60. On February 25, 2016, Defendants answered the Complaint and filed Amended Counterclaims against SHST. ECF No. 76. Defendants brought the following counterclaims: declaratory relief, intentional interference with contract, intentional interference with prospective business advantage, negligent interference with prospective economic relations, conversion, trespass to chattels, misappropriation of trade secrets, infringement of four patents, trademark infringement, contributory trademark infringement, unfair competition and false designation of origin, violation of anti-cybersquatting, direct copyright infringement, secondary copyright infringement, unjust enrichment, and unfair competition. See generally id. On March 4, 2016, the Court stayed SHST's obligation to respond to Defendants' Amended Counterclaims until the resolution of the parties' declaratory relief claims. ECF No. 86.

On March 18, 2016, the parties' filed a stipulation and proposed order to substitute SHST. ECF No. 92. Counsel for SHST represented that SHST transferred all of its interest in the MOVA Assets to Virtue Global Holdings Limited ("VGH"). Id. The parties agreed to the substitution of VGH as the Plaintiff in the case but also agreed that SHST would remain in the case as a Counterclaim Defendant and that all counterclaims asserted by Defendants against SHST would continue as pleaded against both SHST and VGH. Id. The Court granted the stipulation. ECF No. 96.

On March 18, 2016, Defendants filed their Answer and Amended Counterclaims. ECF No. 95. Defendants added an additional counterclaim under the California Uniform Fraudulent Transfer Act.[1] See id. ¶¶ 424–433. Defendants allege that SHST transferred the MOVA Assets to

---

[1] The California Uniform Fraudulent Transfer Act is now known as the California Uniform Voidable Transfers Act. It was amended by 2015 Cal SB 161, effective January 1, 2016.

2

1    VGH "with the actual intent to hinder, delay or defraud Defendants in this case." Id. ¶ 425.

2    **B.    Transfer of the MOVA Assets from SHST to VGH**

3    The document transferring the MOVA Assets from SHST to VGH was signed one day

4    after the Court granted Defendants' request to amend their answer and to file counterclaims. See

5    ECF No. 139, Seraphine Decl., Ex. 1. While SHST alleges to have paid $100,000 to acquire the

6    MOVA Assets from MO2 LLC in February 2013, VGH paid $25,000 for the MOVA assets, with

7    an additional $25,000 due upon a decision by the Court in SHST's favor. ECF No. 139 at 10; see

8    Ex. 1 at 4 (Bates No. SHST0002177).[2] The agreement transfers the MOVA Assets to VGH but

9    leaves all the liabilities with SHST. Id.

10   VGH explains the purpose of the transfer as follows: VGH's parent, Digital Domain

11   Holdings Limited ("DDHL"), "recognized that a company which it did not wholly own held title

12   to the MOVA Assets and determined that – for reasons unrelated to this litigation – a wholly-

13   owned entity should hold title." ECF No. 151 at 7; ECF No. 152, Chopra Decl. ¶ 7. DDHL

14   accordingly took the steps to transfer title from SHST to VGH, a "holding company in the DDHL

15   family." Chopra Decl. ¶ 7. VGH obtained title subject to the licenses which SHST previously

16   granted. Id. VGH does not have physical possession of the MOVA Assets and has not used them.

17   Id. ¶ 8.

18   **C.    SHST and VGH's Discovery Conduct**

19   Defendants assert that SHST has not participated in good faith in discovery, which is the

20   subject of a motion for default judgment Defendants filed against SHST now before Magistrate

21   Judge Sallie Kim.[3] See ECF No. 132; ECF No. 143.

22   In a joint discovery letter brief submitted to Magistrate Judge Kim, counsel for SHST

23   stated that SHST "appears to have gone dormant." ECF No. 132 at 5. Counsel disclosed:

24

25   [2] Citations are to the pages assigned by the Court's electronic case filing system and not to the internal pagination of the document.

26   [3] Defendants originally sought entry of default against SHST as a remedy in the present motion,
27   but the Court declined to entertain that request in the first instance because Defendants sought this remedy as a discovery sanction, and the Court had previously referred all discovery disputes to Judge Kim for adjudication. ECF No. 143. Judge Kim heard the motion for default judgment on
28   June 16, 2016.

3

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

VGH purchased the MOVA Assets from SHST in December 2015, and substituted into this case as Plaintiff. (Dkt. 96). Following the sale of the MOVA Assets, SHST appears to have gone dormant. Only in March 2016 – after SHST apparently went dormant – did Defendants' new counsel begin demanding verifications for SHST's discovery responses from the previous summer. Despite diligent efforts, SHST's counsel has not received any response to any of its multiple attempts to communicate with SHST, including to obtain the requested verifications. From SHST's silence, it appears that SHST no longer has any active business, no officers, no active board members, no employees, and no one else who can provide the verifications which Defendants began demanding in March 2016. Accordingly, the undersigned counsel will be taking necessary steps to initiate the process of withdrawing as counsel of record for SHST in this litigation.

Id. Counsel for SHST state they intend to "take the necessary steps to initiate the process of withdrawing as counsel of record for SHST in this litigation." Id.

Additionally, Defendants propounded interrogatories on VGH requesting VGH to identify "all directors, shareholders, and/or employees of SHST and/or VGH" with knowledge about the acquisition of MOVA Assets by SHST from MO2 LLC and by VGH from SHST. See ECF No. 139, Seraphine Decl., Ex. 7. VGH responded that "there are no current directors, shareholders, and/or employees of VGH with knowledge of the acquisition of the MOVA Assets" from either MO2 LLC or SHST, id., notwithstanding that VGH purports to own those assets.

**D.    Present Use of the MOVA Assets**

At present, Digital Domain 3.0, Inc. ("DD3"), a licensee of the MOVA Assets, possesses the physical MOVA Assets, and DD3 and LaSalle are using the Assets. ECF No. 151 at 8; ECF No. 44-2; LaSalle Decl. ¶ 52. DD3 is wholly-owned by Digital Domain-Reliance LLC ("DDR"), and 70% of DDR is owned by DDHL.[4] DDHL owns 100% of VGH. ECF No. 144-3 Boyd Decl., Ex. B at 7 and 15.

When LaSalle purportedly began secret negotiations to sell the MOVA Assets, he began with DD3. ECF No. 121 ¶¶ 113–116. Ultimately, LaSalle sold the MOVA Assets to SHST, although DD3's General Counsel and Vice President of Business Affairs, Joseph Gabriel, negotiated the sale of the MOVA Assets – on behalf of SHST. ECF No. 44-19, Gabriel Decl. ¶ 8.

---

[4] Defendants report that DDHL proposed a transaction to acquire the other 30% of DDR (and thus, wholly own DD3) to be voted on by shareholders at an annual meeting on June 7, 2016 in Hong Kong. See ECF No. 144 at 4; ECF No. 144-4, Boyd Decl., Ex. C.

4

1    DD3 then entered into an exclusive license regarding the MOVA Assets and took possession of

2    the physical MOVA Assets.  Id.  Gabriel's declaration is silent regarding the details of this

3    transaction and how he could represent a party that is nominally adverse to his own client.  Id.

4    These circumstances give rise to substantial doubt whether DD3 is a wholly separate entity from

5    either VGH or SHST.

6        DD3 has used the MOVA Assets to provide visual effects for a number of movies,

7    including for the character "Colossus" in the film "Deadpool."  ECF No. 139 at 11.  Defendants

8    have not provided a license to any party for the MOVA Assets with which DD3 has used the

9    MOVA Assets.  Id.

10       **E.    Motion for Preliminary Injunction**

11       On May 6, 2016, Defendants filed the instant motion for preliminary injunction regarding

12   the MOVA Assets.  ECF No. 139.  Defendants filed the motion for preliminary injunction four

13   days after SHST's counsel informed the Court that SHST "appears to have gone dormant."

14   Defendants propose the injunction take the following form:

15       1.  This preliminary injunction applies to the MOVA Assets, which are
            defined as the MOVA physical property and MOVA patents,
16          trademarks and copyrighted material and derivative works identified
            in the Amended Counterclaims (D.I. 100) in this case;
17
         2.  This preliminary injunction includes the MOVA Assets in the
18          possession of VGH and SHST, or in the possession of any of
            SHST's or VGH's licensees and their respective sub-licensees
19          (including but not limited to DD3);

20       3.  SHST, VGH and anyone in concert therewith on whom notice of
            this Order is served (including Mova Asset licensee DD3 and all of
21          its Mova Asset licensees, and including the producers and
            distributors of motion pictures, video games or any other material in
22          which any portion of the Mova Assets is used, even if such use is
            pursuant to a purported license issued by Plaintiff, its licensees
23          and/or their respective sublicensees) shall cease all use of the
            physical MOVA Assets (and secure those assets in a neutral
24          location), cease all use of all MOVA Assets trademarks, cease
            practicing all MOVA Assets patented inventions, and cease use or
25          distribution of all MOVA Assets copyrighted material and all
            derivative works thereof;
26       4.  SHST and VGH are hereby enjoined from making any purported
            transfer of the MOVA Assets to any other party;
27
         5.  This preliminary injunction shall remain in place until further Order
28          by the Court.

5

United States District Court
Northern District of California

1    ECF No. 139-15 (Proposed Order).

2          On May 20, 2016, VGH filed an opposition to the motion. ECF No. 151. On May 27,

3    2016, Defendants filed a reply. ECF No. 159. The Court heard oral argument on June 16, 2016.

4    **II.    LEGAL STANDARD**

5          Preliminary relief is "an extraordinary remedy that may only be awarded upon a clear

6    showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555

7    U.S. 7, 22 (2008). To obtain preliminary injunctive relief, the moving party must show: (1) a

8    likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the

9    absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and

10   (4) that an injunction is in the public interest. Id. at 20. "[S]erious questions going to the merits

11   and a balance of hardships that tips sharply towards the plaintiff can support issuance of a

12   preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable

13   injury and that the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell,

14   632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).

15         Preliminary relief may take two forms: it may be prohibitory or mandatory in nature. "A

16   prohibitory injunction prohibits a party from taking action and preserves the status quo pending a

17   determination of the action on the merits." Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH

18   & Co., 571 F.3d 873, 878 (9th Cir. 2009) (internal alterations and quotation marks omitted). A

19   mandatory injunction orders a party to take action. Id. at 879. Because mandatory injunctions do

20   more than preserve the status quo, they are "particularly disfavored," the Ninth Circuit has

21   observed that "courts should be extremely cautious about issuing a preliminary injunction" in

22   those circumstances. Martin v. Int'l Olympic Committee, 740 F.2d 670, 675 (9th Cir. 1984).

23         Due to the exigent nature of a preliminary injunction, a court may consider hearsay and

24   other evidence that would otherwise be inadmissible at trial. See Johnson v. Couturier, 572 F.3d

25   1067, 1083 (9th Cir. 2009); see also Flynt Distrib. Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir.

26   1984) ("The trial court may give even inadmissible evidence some weight, when to do so serves

27   the purpose of preventing irreparable harm before trial.").

28

United States District Court
Northern District of California

6

APPX9

## III.    DISCUSSION

Defendants argue they are entitled to a preliminary injunction protecting the MOVA Assets pending a determination of ownership regarding the Assets. ECF No. 139.  VGH makes several arguments in opposition to Defendants' motion.

### A.    Defendant's Motion is not Procedurally Defective

First, VGH argues that Defendants' motion is untimely and improper because the Court bifurcated the case so that any declaratory relief claims would be tried first, and stayed Defendants' remaining counterclaims. ECF Nos. 80, 86.  VGH contends that Defendants now seek to have the merits of their fraudulent transfer counterclaim addressed before the Court can determine who owns the MOVA Assets and before Plaintiff has even answered the counterclaim, and argue – without citation to authority – that the Court lacks the power to issue a preliminary injunction regarding claims that have been stayed. ECF No. 151 at 8–9.

The Court concludes that it does have this power.  <u>PMS Distributing Co. v. Huber & Suhner, A.G.</u>, 863 F.2d 639 (9th Cir. 1988).  In <u>PMS Distributing</u>, where the Ninth Circuit upheld the district court's grant a writ of possession pending the outcome of the arbitration after the court entered an order to compel arbitration.  863 F.2d at 642.  As the court noted, "the congressional desire to enforce arbitration agreements would frequently be frustrated if the courts were precluded from issuing preliminary injunctive relief to preserve the status quo pending arbitration and, *ipso facto,* the meaningfulness of the arbitration process."  <u>Id.</u> at 642–43.  Similarly here, the Court's ability to manage the litigation would be frustrated if it could not issue preliminary injunctive relief to preserve the status quo pending the final resolution of the parties' claims – including the claims that have been stayed.

### B.    Defendant's Motion is Not Legally Defective

VGH next argues that Defendants' motion is legally defective because Defendants' claims for ownership over the MOVA Assets require Defendants to establish they hold title to the MOVA Assets before the Court can grant relief.  <u>See</u> ECF No. 151 at 9.  VGH similarly contends that Defendants do not have a current right to damages because Defendants have not established ownership and their counterclaims seeking damages are not viable.  Accordingly, VGH argues that

7

United States District Court
Northern District of California

APPX10

1    Defendants cannot be a "creditor" within the meaning of California's Uniform Voidable

2    Transactions Act. Id. at 11.

3         These arguments have no force.  Ordinarily, a court may not issue preliminary injunction

4    regarding assets to which a party does not yet have a legal claim.  However, the court may issue a

5    preliminary injunction in cases involving bankruptcy and fraudulent conveyances and cases in

6    which equitable relief is sought.  See In re Focus Media Inc., 387 F.3d 1077, 1085 (9th Cir. 2004)

7    (citing Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc., 527 U.S. 308, 312 (1999)).

8    The Court may enter a preliminary injunction over the MOVA Assets on Defendants' fraudulent

9    conveyance claim even though Defendants have not yet established an interest in the assets.  See,

10   e.g., Wimbledon Fund, SPC Class TT v. Graybox, LLC, No. 15-56540, --- Fed. Appx. ----, 2016

11   WL 1554271, at *1 (9th Cir. Apr. 18, 2016) (upholding the district court's grant of a preliminary

12   injunction on a claim under the California Uniform Fraudulent Conveyance Act even though the

13   party seeking the injunction had not yet established an interest in the assets).

14        VGH also argues that Defendants' counterclaims "will never be viable because the statutes

15   and laws on which they are based cannot be given extraterritorial effect."  ECF No. 151 at 10.

16   VGH points out that both VGH and SHST are foreign entities and contends that they have not

17   engaged in activity in the United States.  Id.  However, VGH's arguments focus on the

18   extraterritoriality effect of Defendants' intellectual property claims and not Defendants' fraudulent

19   conveyance claim.  See id. at 9–10.  And to the extent VGH makes a personal jurisdiction

20   argument, SHST and VGH committed to the Court's jurisdiction by filing suit here.  By instituting

21   this action, SHST and VGH have submitted to the Court's jurisdiction not only as to its own

22   claims but also as to Defendants' fraudulent conveyance counterclaim.  See Threlkeld v. Tucker,

23   496 F.2d 1101, 1103 (9th Cir. 1974).

24   C.    **Defendants Have Met Their Burden to Show that a Preliminary Injunction Should Issue**

25        Turning to the merits of Defendants' motion, the Court now addresses the elements

26   Defendants must establish to prevail on their request for a preliminary injunction.

27

28

United States District Court
Northern District of California

8

United States District Court
Northern District of California

1

**1.    Likelihood of Success of the Merits**

First, Defendants must establish a likelihood of success on the merits of their fraudulent conveyance claim. See Winter, 555 U.S. at 20.

California's Uniform Voidable Transactions Act ("CUVTA") provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.
>
> . . .
>
> (b) In determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any or all of the following:
>
> (1) Whether the transfer or obligation was to an insider.
>
> (2) Whether the debtor retained possession or control of the property transferred after the transfer.
>
> (3) Whether the transfer or obligation was disclosed or concealed.
>
> (4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
>
> (5) Whether the transfer was of substantially all the debtor's assets.
>
> (6) Whether the debtor absconded.
>
> (7) Whether the debtor removed or concealed assets.
>
> (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
>
> (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
>
> (10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.
>
> (11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

Cal. Civ. Code § 3439.04. The enumerated factors are nonexclusive and are "regarded as

9

1   circumstantial 'badges of fraud' that are probative of intent." In re Beverly, 374 B.R. 221, 235

2   (B.A.P. 9th Cir. 2007). "No minimum number of factors tips the scales toward actual intent." Id.

3   at 236. However, "specific evidence may negate an inference of fraud notwithstanding the

4   presence of a number of 'badges of fraud.'" Id.

5        A creditor is a person who has a claim, meaning "a right to payment, whether or not the

6   right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,

7   disputed, undisputed, legal, equitable, secured, or unsecured." See id. § 3439.01(b)–(c). A debtor

8   is "a person who is liable on a claim." Id. § 3439.01(e). Under the CUVTA, a creditor may obtain

9   "an injunction against further disposition by the debtor or a transferee, or both, of the asset

10  transferred or its proceeds." Id. § 3439.07(a)(3)(A).

11       Defendants argue that SHST's transfer of the MOVA assets, but not the liabilities

12  associated with those assets, shows that the transfer was fraudulent and designed to avoid a

13  judgment against SHST. ECF No. 139 at 15. Defendants contend several "badges of fraud"

14  demonstrate SHST's fraudulent intent in transferring the MOVA Assets to VGH.

15       First, Defendants assert that the "the transfer or obligation was to an insider." Cal. Civ.

16  Code § 3439.04(b)(1). Defendants contend SHST shares common ownership and management

17  with DDHL, of which VGH is a wholly-owned subsidiary. "Common ownership indicates that

18  the SHST and DDHL/VGH are close; common management indicates that DDHL/VGH can exert

19  control or influence over SHST." ECF No. 139 at 16. Amit Chopra, DDHL's Executive Director

20  and COO explained DDHL wholly owns VGH but DDHL did not wholly own SHST. ECF No.

21  152, Chopra Decl. ¶ 7. Additionally, as part of the initial acquisition of MOVA technology,

22  counsel for DD3 "was instructed to move forward with acquiring the MOVA Assets and investing

23  in a MOVA-related business through [SHST]." ECF No. 44-19, Gabriel Decl. ¶ 8. DD3's general

24  counsel represented SHST in connection with the acquisition of the MOVA Assets and negotiation

25  of the license with DD3. Id. The Court finds that the transfer of the MOVA assets was to an

26  insider. The Ninth Circuit has recognized that "a special relationship between the debtor and the

27  transferee" is one of the "more common circumstantial indicia of fraudulent intent." In re

28  Acequia, Inc., 34 F.3d 800, 806 (9th Cir. 1994) (italics omitted) (quoting Max Sugarman Funeral

United States District Court
Northern District of California

10

APPX13

United States District Court
Northern District of California

1    Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254 (1st Cir. 1991)).

2         Defendants next contend that "the debtor retained possession or control of the property

3    transferred after the transfer." ECF No. 139 at 16 (citing Cal. Civ. Code § 3439.04(b)(2)). The

4    evidence does not support this contention. VGH has control of the MOVA assets, and non-party

5    DD3 had – and apparently maintains – physical possession of them.[5] Defendants argue that, on

6    this basis, SHST effectively retained possession of the MOVA Assets after the transfer. However,

7    as Defendants have not established DDHL shares common ownership and management with

8    SHST, Defendants have not shown SHST retained possession or control of the property.

9         Nonetheless, other badges of fraud exist in this case. That a debtor has been sued or

10   threatened with suit before the transfer was made indicates fraudulent intent. Cal. Civ. Code §

11   3439.04(b)(4). SHST made the transfer a mere one day after the Court granted Defendants'

12   request to amend counterclaims. VGH states that the process was contemplated months before but

13   was not executed until the day after the case management conference. This contention,

14   particularly in light of the other suspicious circumstances of this transfer and SHST's conduct, is

15   not credible. The Court is persuaded that the timing of the transfer of the MOVA Assets indicates

16   that it was made to avoid liability.

17        The Court further finds that that SHST concealed the transfer, another indicator of

18   fraudulent intent. See Cal. Civ. Code § 3439.04(b)(3). SHST did not reveal the transfer for over

19   two months after its occurrence and continued to act as the Plaintiff in the case. SHST did not

20   alert the Court or Defendants about the transfer until after Defendants filed their amended

21   counterclaims. See ECF No. 92.

22        Whether the "the value of the consideration received by the debtor was reasonably

23   equivalent to the value of the asset transferred or the amount of the obligation incurred" is another

24   badge of fraud. Cal. Civ. Code § 3439.04(b)(8). Here, VGH paid $25,000 for the MOVA Assets

25

26   _____

27   [5] At the hearing on this motion, counsel for VGH confirmed that VGH exercises sufficient
     dominion over the MOVA assets that it could "take whatever steps are necessary to make sure
     those assets are available in the event" of a favorable ruling for Defendants on their declaratory

28   relief claims. The Court concludes from this representation that VGH also has sufficient control
     over those assets to comply with this injunction.

                                              11

                                          APPX14

1   with an additional $25,000 due upon a Court decision in SHST's favor.  SHST allegedly paid

2   $100,000 to purchase the same Assets.  Defendants argue, and the Court agrees, the consideration

3   received by SHST was less than the value of the MOVA Assets.

4       Defendants contend, and the Court agrees, that SHST transferred substantially all of its

5   assets.  ECF No. 139 at 17 (citing to Cal. Civ. Code § 3439.04(b)(5)).  SHST transferred all of its

6   MOVA Assets to VGH and went dormant.  VGH does not dispute this factor.

7       Finally, Defendants argue SHST explicitly transferred the MOVA Assets while retaining

8   the liabilities has "absconded."  See ECF No. 139 at 17 (citing to Cal. Civ. Code § 3439.04(b)(6)).

9   Defendants argue that SHST used the transfer as a means to "shoulder the debt but strip [it]self of

10  assets with which to pay the debt."  Id. (quoting In re Beverly, 374 B.R. at 227).  SHST has gone

11  dormant, and SHST's counsel admits that it has not received any responses to counsel's attempts

12  to communicate with SHST.  The Court finds SHST has absconded from this action.

13      The confluence of these several badges of fraud constitutes substantial evidence of VGH

14  and SHST's actual intent to defraud.  See In re Acequia, Inc., 34 F.3d 800, 806 (9th Cir. 1994).

15  VGH does not offer "significantly clear evidence of a legitimate supervening purpose."  Id.  The

16  Court concludes Defendants have shown a likelihood of success on the merits on their fraudulent

17  conveyance claim.

18      **2.**    **Likelihood of Irreparable Harm**

19      To obtain preliminary relief, Plaintiff must "demonstrate that irreparable injury is likely in

20  the absence of an injunction."  Winter, 555 U.S. at 22.  If the plaintiff's harm is merely monetary,

21  it will not usually support injunctive relief.  California Pharmacists Association v. Maxwell–Jolly,

22  563 F.3d 847, 851–52 (9th Cir. 2009) ("Typically, monetary harm does not constitute irreparable

23  harm . . . . Economic damages are not traditionally considered irreparable because the injury *can*

24  *later be remedied by a damage award*." (emphasis original)).  A party seeking an asset freeze must

25  show a likelihood of dissipation of the claimed assets, or other inability to recover monetary

26  damages, if relief is not granted.  Johnson v. Couturier, 572 F.3d 1067, 1085 (9th Cir. 2009).

27      VGH argues that the time that has elapsed from the commencement of this action to the

28  instant motion for a preliminary injunction undermines Defendants' arguments regarding

United States District Court
Northern District of California

12

1    irreparable harm. ECF No. 151 at 13. Defendants, however, have not been dilatory in bringing

2    the instant motion. Within four days of learning SHST ceased participating in this case,

3    Defendants filed the motion for a preliminary injunction. See ECF Nos. 132, 139.

4        Defendants assert several facts that weigh in favor of finding that Defendants would suffer

5    irreparably harm. SHST made the transfer of the MOVA Assets to VGH immediately after the

6    Court granted Defendants' request to amend counterclaims. Cf. Datatech Enterprises LLC v. FF

7    Magnat Ltd., No. C 12-04500 CRB, 2012 WL 4068624, at *5 (N.D. Cal. Sept. 14, 2012) (finding

8    that the defendant's efforts to move its domain name registration and money overseas after being

9    served with the complaint establishes a likelihood of asset dissipation and irreparable harm).

10   SHST's conduct to date, including its non-responsiveness, also indicates a threat of irreparable

11   harm. SHST transferred its assets but retained its liabilities, rendering it incapable of satisfying

12   any judgment. Finally, Defendants posit that VGH's interrogatory response indicates that some of

13   the physical MOVA Assets have been disposed of. See ECF No. 139 at 26; ECF No. 139-14,

14   Seraphine Decl., Ex. 13. VGH responded that "certain hardware included in the MOVA Assets

15   ha[ve] been discarded over the years," including:

16       1 Maxtor USB hard drive, 1 LG internal dvd rw drive, 3 Kino Flow
         ballasts, a Basler A102f camera, four Dell PCs, an Apple MacBook
17       Pro 15", and a HP Elitebook 8440 P. VGH responds that, based on
         the investigation conducted to date, the remaining MOVA Assets
18       are either located at Digital Domain, Inc., 12641 Beatrice St., Los
         Angeles CA 90066 or in storage controlled by Digital Domain, Inc.

19   ECF No. 139-14, Seraphine Decl., Ex. 13.

20       Defendants have shown a likelihood of dissipation of the claimed assets and that it will

21   suffer from irreparable harm as a result.

22           3.       Balance of the Equities

23       In considering the equities of a preliminary injunction, courts "must balance the competing

24   claims of injury and must consider the effect on each party of the granting or withholding of the

25   requested relief." Winter, 555 U.S. at 24.

26       VGH states that Defendants have provided no reason why DD3 should be deprived of

27   using the MOVA Assets, as it has done since 2013. ECF No. 151 at 19. The Court acknowledges

28

United States District Court
Northern District of California

that an asset freeze would adversely affect DD3, a licensee of the MOVA intellectual property and the present user of the physical assets. As Defendants point out, however, VGH has not identified harm that *VGH* will suffer if the MOVA Assets are frozen and maintained at a neutral location. ECF No. 159 at 9. Defendants contend that the proposed injunction does not prohibit VGH from conducting its other business operations. ECF No. 139 at 23.

Defendants, on the other hand, argue that equity tips sharply in their favor because Defendants run the risk of being left with no remedy as a result of SHST's fraudulent transfer. ECF No. 139 at 23. VGH retains ownership of the MOVA Assets but not with respect to the liabilities.

In the absence of evidence to the contrary, the Court concludes that the harm – that Defendants may not be able to recover against VGH – is greater than the harm to VGH in freezing the MOVA Assets before trial.

### 4.    Public Interest

When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be "at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction." Bernhardt v. L.A. County, 339 F.3d 920, 931 (9th Cir. 2003). If, however, the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction. See Sammartano v. First Judicial Dist. Court, 303 F.3d 959, 965 (9th Cir. 2002) ("In cases where the public interest is involved, the district court must also examine whether the public interest favors the plaintiff.").

In this case, the requested injunction reaches beyond the parties to affect the rights of third party DD3, a licensee of the MOVA assets. VGH contends that freezing the MOVA Assets would block the productive use of the MOVA Assets by DD3 and the public would be deprived of entertainment from movies using MOVA. Weighing against this interest are the public's interest in discouraging fraudulent conveyances and the possibility that Defendants will not be able to obtain adequate relief on their claims. Balancing the equities, the Court concludes that the public interest will be served by the issuance of a preliminary injunction.

14

### D.    Defendants' Injunction Can Bind DD3

VGH argues that because DD3 is a nonparty, the preliminary injunction cannot enjoin DD3. ECF No. 151 at 11–12.  While DD3 will not be named as a party to the injunction, the injunction will apply to parties, their agents, employees and persons "in active concert or participation with them and who receive notice of the preliminary injunction." Fed. R. Civ. P. 65(d)(2)(C).

### E.    Bond Requirement

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

Defendants ask the Court to dispense with the bond requirement, contending that the Court may do so if "there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." ECF No. 139 at 26–27 (quoting Kremen v. Cohen, No. 5:11-CV-05411-LHK, 2011 WL 6113198, at *8 (N.D. Cal. Dec. 7, 2011)).  Defendants argue that VGH, as a holding company, will not be prejudiced by freezing the asset.

The Court finds there is a likelihood of harm to VGH should the preliminary injunction later be found to have issued in error.  The Court will set a bond in the amount of $25,000.

### CONCLUSION

The Court grants Defendants' motion for a preliminary injunction as follows:

1.          This preliminary injunction applies to the MOVA Assets identified in the Amended Counterclaims, ECF No. 100, which consist of the MOVA® Contour® Reality Capture ("MOVA" or "MOVA Contour") technology, and related hardware and software, source code, patents and patent applications, trademarks, copyrights, trade secrets, domain names, business records, and various physical goods ("MOVA Assets").

2.    Shenzhenshi Haitiecheng Science and Technology Co., Ltd. ("SHST") and Virtue Global Holdings Limited ("VGH") are hereby restrained and enjoined, pending trial, from selling, using, moving, concealing, transferring or otherwise disposing of any MOVA Asset in its

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1 possession, custody or control.

2     3.     Within 10 days of this order, VGH is ordered to transfer any physical MOVA

3 assets to a secure location of Defendants' choosing.  The costs of placing and maintaining the

4 MOVA assets at such location shall be borne by Defendants, subject to reallocation.

5     4.     This Order does not give Defendants the right to use, license, or transfer any

6 MOVA asset beyond what is expressly permitted by this order.  The purpose of this order is to

7 maintain the status quo.

8     5.     Within 10 days of entry of this Order, VGH is ordered to transmit a copy of this

9 preliminary injunction to its MOVA Asset licensees, including DD3, and any producers,

10 distributors of motion pictures, video games, or any other material in which the MOVA Assets are

11 used.

12     6.     As a condition of this Preliminary Injunction, Defendants are ordered to post a

13 bond in the amount of $25,000 to secure payment of any damages sustained by VGH or SHST if

14 they are later found to have been wrongfully enjoined.  This Order shall become effective upon

15 posting of the bond and shall remain in effect until further order by the Court.

16     IT IS SO ORDERED.

17 Dated:  June 17, 2016

18

19                                              JON S. TIGAR
                                          United States District Judge
20

21

22

23

24

25

26

27

28

16

APPX19

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  June 27, 2017

*/s/Jon Michaelson*
Jon Michaelson
Kilpatrick Townsend & Stockton LLP
1080 Marsh Road
Menlo Park, CA  94025
Telephone: 650-326-2400
Facsimile:  650-326-2422

Attorneys for Plaintiff-Appellant
VIRTUE GLOBAL HOLDINGS LIMITED

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) or Fed. R. App. P. 28.1(e).

1.    This brief contains 12,973 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) or Fed. R. App. P. 28.1(e) and the type style requirements of Fed. R. App. P. 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 using 14-point proportional spacing in Times New Roman type style.

Dated:  June 27, 2017

*/s/ Jon Michaelson*
Jon Michaelson
Kilpatrick Townsend & Stockton LLP
1080 Marsh Road
Menlo Park, CA  94025
Telephone: 650-326-2400
Facsimile:  650-326-2422

Attorneys for Plaintiff-Appellant
VIRTUE GLOBAL HOLDINGS LIMITED